Filed 8/26/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| TRIBECA COMPANIES, LLC,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>FIRST AMERICAN TITLE INSURANCE COMPANY,<br><br>    Defendant and Respondent. | A142430<br><br>(San Francisco County<br>Super. Ct. No. CGC-11-508444) |

Plaintiff Tribeca Companies, LLC (Tribeca) appeals from the judgment of the trial court in favor of defendant First American Title Insurance Company (First American). Tribeca initiated this lawsuit after First American refunded a $1 million deposit to a real estate investor out of an escrow account that Tribeca had opened. Tribeca claimed it was entitled to the deposit and asserted claims for breach of contract, breach of fiduciary duty, fraud, and negligence. After a bench trial, the court found in favor of First American. We affirm.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

#### I.    *Background*

Tribeca is a California limited liability company formed in October 2005 by William Faidi, its sole shareholder. It is a San Francisco-based private equity investment firm that makes investments in "distressed" real estate by purchasing and foreclosing on defaulted mortgage loans. Sky Pacific Holdings I, LLC (Sky Pacific) is another California limited liability company also formed by Faidi, who is its sole member.

Tribeca and Sky Pacific are separate and distinct legal entities, created at different times for different purposes. Sky Pacific is a single-purpose entity, originally formed in

late 2009 to facilitate an investment transaction involving a distressed loan, referred to at trial as the "UBS transaction."[1] Ultimately, Faidi used a different entity formed under Delaware law for that transaction.

Sergey Grishin was introduced to Faidi as a prospective investor by Dovi Frances of Deutsche Bank. Grishin and Faidi decided to form a joint venture to pursue investment opportunities compatible with Faidi's strategy of purchasing senior mortgage notes on distressed real estate. On April 1, 2010, they executed a limited liability company agreement for that purpose, referred to at trial as the "joint venture agreement" (JVA).

## II.    *The Joint Venture*

Grishin's and Faidi's joint venture was structured as a two-member limited liability company named Sky Group Ventures, LLC (Sky Group), whose articles of incorporation were filed on April 5, 2010. The "Tribeca Member" of the joint venture was Sky Pacific, which acted as Sky Group's manager. The other member of Sky Group, referred to in the JVA as the "SGA Member,"[2] was an entity created for Grishin named SGSF Capital Venture, LLC (SGSF).[3] Neither Tribeca nor Grishin were designated as members of Sky Group.

The JVA described general protocols for investment in real estate loan portfolios, but did not specifically identify any proposed investments. As the managing member, Sky Pacific was to take all actions in furtherance of Sky Group's business. The acquisition of any investment was conditioned on review and prior approval by both members of the joint venture. SGSF was responsible for providing the entire funding needed for Sky Group to acquire an approved investment.

---

[1] "UBS" is an acronym for United Bank of Switzerland.

[2] SGA is the acronym for SG Acquisitions, LLC. SGA was the principal investment vehicle for Grishin.

[3] Section 12.15 of the JVA effectively provided that Grishin himself would have no personal liability for any obligations owed by SGSF under the JVA.

Pursuant to a proposed escrow agreement—attached to the JVA as Exhibit B and entitled, "Staggered Escrow Agreement Regarding Investment" (Exhibit B)—following Sky Pacific's presentation of a prospective investment, SGSF was to deposit the sum of $1 million into an escrow account that Sky Pacific would open. If SGSF thereafter failed to approve the prospective investment, this deposit would be refundable. If SGSF reviewed and approved the investment, then the deposit would become nonrefundable and would be applied toward the actual costs of acquiring the investment. SGSF would then deposit the balance of the funds necessary to acquire the investment.[4] If it failed to make any such deposit, the initial contribution of $1 million was to be "immediately released to [Sky Pacific] as liquidated damages."

The last paragraph of Exhibit B states: "An agreement substantially similar to this Exhibit B shall be presented to Escrow Agent by SGA Member and Tribeca Member in connection with each prospective Investment, shall be modified for each such Investment to change the amount of the Initial Deposit, if applicable, and to change the applicable dates, and shall serve as a binding Escrow Instruction with respect to such Investment." (Emphasis omitted.)

### III.    *The Proposed Investment in the J.E. Roberts Note*

As its first proposed investment, the two Sky Group members focused on a senior mortgage note known as the J.E. Roberts Note, which was secured by various San Francisco commercial properties owned or controlled by Frank and Walter Lembi. Prior to the 2008 real estate crash, the Lembis had borrowed substantial sums to buy apartment buildings, and by 2009 they had defaulted on many of their loan obligations. The J.E. Roberts Note was one such obligation. Tribeca had been pursuing negotiations to buy the J.E. Roberts Note prior to Grishin's involvement.

---

[4] In this case, the total acquisition price for the joint venture's prospective investment was estimated at around $47 million.

## IV.    *The First American Escrow*

In March 2010, Faidi instructed Tribeca asset manager Alicia Jeffrey to set up an escrow account at First American in anticipation of Sky Group's investment in the J.E. Roberts Note.  She understood the purpose of the escrow was to hold funds that could later be transferred to a transactional escrow once the investment was put under contract.

On March 31, 2010, Jeffrey contacted First American senior escrow officer Heather Kucala.  Kucala was the escrow officer Tribeca had used for the UBS transaction.  Jeffrey testified at trial that she told Kucala the new escrow account would hold a deposit from an investor in a joint venture.  She identified the proposed escrow using the term "staggered escrow account," and indicated this term would likely appear on an incoming wire transfer and should be referenced in the escrow file.  Kucala asked what "staggered escrow" meant, and Jeffrey replied that she did not know.[5]  Kucala said it did not matter because the term would appear in the "reference line" only.  Kucala did not ask to see a copy of the JVA and did not indicate that First American would have any problem in setting up the account.  Kucala also did not ask for the name of the investor and Jeffrey did not mention Grishin by name.  Kucala provided Jeffrey with wiring instructions and an escrow account number, NCS-435-432-SF.  Jeffrey gave the wiring information to a coworker with directions to forward the information to Grishin.

At trial, Kucala denied Jeffrey had told her the escrow funds were coming from a third party investor.  Instead, Jeffrey said she wanted a "single-party" escrow, sometimes referred to as a "holding" escrow.  Kucala acknowledged Jeffrey used the term "staggered escrow account," which Kucala had never heard before.  If Jeffrey had said the account would hold funds from an investor, Kucala would have required a third party authorization.

---

[5] Faidi testified that "staggered escrow" was "a phrase that [he] came up with in the course of the negotiation of the joint venture agreement with SGA."

## V.    *The Escrow Instructions*

On April 1, 2010, Kucala emailed Jeffrey documents necessary to open the escrow account, including draft escrow instructions entitled, "Escrow Instructions (Single Party Escrow)" (Single Party Instructions).  In these instructions, Tribeca is clearly identified as the "Depositor."  Before the Single Party Instructions were finalized, Jeffrey specifically asked Kucala to open the escrow account in Tribeca's name and to include Tribeca's tax identification number and business address in the escrow instructions.

The draft Single Party Instructions provided that "Depositor and Escrow Agent have agreed that the sum of $1,000,000.00 . . . be deposited *by Depositor* with Escrow Agent for subsequent disbursement upon the terms and conditions set forth in these Instructions."  (Italics added.)  The finalized document retains this language and further states: "Escrow Agent shall retain the Escrowed Funds until such time as instructed in writing by Depositor to disburse the Escrowed Funds (including any interest earned thereon) to Depositor or such third party or parties as may be designated by Depositor."

Kucala prepared the draft instructions in a single party format with the understanding that Tribeca itself would be depositing the funds and that there would be no other principals or signatories to the escrow.  In this respect, the arrangement was unlike a conventional escrow, in which two or more parties on opposite sides of a transaction deposit funds and documents for future exchange after the closing conditions are met.  Tribeca had utilized a similar holding escrow for the earlier UBS transaction.  On that occasion, Kucala received wired funds directly from Faidi and held the funds in a peripheral account while awaiting his subsequent instruction to transfer the funds to a formal transactional escrow.

Tribeca and First American engaged in extensive negotiations regarding the form and content of the Single Party Instructions.  The negotiations continued for more than a

month, and are reflected in numerous email messages contained in the appellate record.[6] Among other things, Tribeca asked for a waiver of the $950 handling fee and the elimination of an indemnification provision. During the negotiations, First American invited Tribeca to propose alternative escrow instructions. Tribeca's instructions did not provide for the handling of third party funds, and did not require a third party's signature.

On April 23, 2010, Jeffrey sent an email to Kucala with proposed alternative escrow instructions. While the JVA provides that instructions substantially similar to Exhibit B are to be provided to the escrow company, Jeffrey did not show Kucala Exhibit B because, at that time, she was not aware of that requirement. As a result, the final Single Party Instructions were not similar to the escrow instructions contained in Exhibit B.

## VI.    *The Wire Transfer*

On April 5, 2010, a wire transfer from Grishin came into First American Trust (an affiliate of First American). The incoming wire was incorrectly processed by Kucala's assistant, Jennifer Bennett, who receipted the money as having originated from Tribeca, not Grishin. Kucala thereafter assumed the $1 million had been deposited by Tribeca. She did not examine the actual incoming wire transfer documentation, though Bennett did include it when she copied Kucala on an April 5 email message to Jeffrey. Kucala does not double-check all of the work that her assistants do. The transfer documentation reflects that the originator was Grishin, not Tribeca. The document references the designated escrow account as "NCS-435-432-SF Staggered Escrow Acct Tribeca SGA."

First American transferred Grishin's funds to an interest-bearing account on April 26, 2010. Jeffrey asked Kucala to open the account in the name "Tribeca Companies, LLC."[7] At that point, Kucala did not tell Jeffrey that a third party instruction

---

[6] During this time, Tribeca did not give First American a copy of the JVA. Jeffrey testified that she chose not to share the JVA with First American because she considered it to contain private information.

[7] Faidi testified that he wanted the escrow instructions to designate Tribeca as the depositor because Tribeca was the representative of Sky Pacific (the managing member

6

would be required in order to disburse the funds because Kucala was unaware of Grishin's role in the proposed transaction. First American's standard procedure is to require third party instructions whenever a third party deposits funds into an escrow. First American's failure to require a third party instruction was largely due to Bennett's failure to process the funds correctly. Kucala testified she would not have countersigned the final instructions if she had known Grishin deposited the $1 million. Additionally, as late as April 26, 2010, Jeffrey still had not told First American there was a liquidated damages provision in the JVA. She also did not say anything about using the escrow account to enforce another party's obligation to pay liquidated damages. If she had divulged this information, Kucala would likely have instructed her to go to an attorney and to place the money in a trust account instead.

On or about April 27, 2010, Tribeca and its attorneys participated in a telephone conference with Kucala and Ed Rusky (First American's in-house counsel) in an effort to resolve the indemnity issue and finalize the Single Party Instructions. During the conference call, Tribeca and its attorneys made no mention of the fact that someone other than Tribeca had deposited the $1 million in the escrow account. They also made no reference to Grishin. Nor was there any mention of Exhibit B. As a result of the conference call, First American agreed to modify the indemnity provision.

## VII.    The J.E. Roberts Deal Falls Apart

As of May 8, 2010, the Single Party Instructions still had not been finalized. On or about that same date, Grishin's attorney, David Smith, informed Faidi by telephone that Grishin wished to proceed with the J.E. Roberts transaction consistent with Exhibit B. As Faidi understood their deal, at that moment Grishin's $1 million deposit became nonrefundable. Grishin himself had not participated in any of the phone conferences leading up to this point. Instead, Tribeca had exchanged emails with Grishin's representatives outlining the steps needed to acquire the J.E. Roberts Note.

---

of Sky Group) and was assigned to do all work necessary to facilitate the J.E. Roberts transaction. He denied he intended to use the First American account as a means to entrap Grishin's money.

They had also discussed the terms of a draft purchase and sale agreement for that investment. At trial, Faidi did not recall ever seeing a written approval for the proposed investment containing Grishin's signature. The JVA at sections 6.6 and 12.3 provides that approval of an investment must be made by a unanimous vote evidenced in writing.

On May 10, 2010, Smith telephoned Faidi and told him Grishin did not have the full amount of funds necessary to proceed with the transaction.[8] Smith asked Jeffrey to supply a broker opinion of value for the properties, possibly to use to obtain financing for the balance of the investment. Faidi decided not to sign a purchase agreement for the J.E. Roberts Note. Sky Group was not under contract to purchase the note and was not bound in any respect to the J.E. Robert Company. A final version of the purchase and sale agreement for the J.E. Roberts Note was never provided to Smith, and Faidi was unsure if he himself ever saw one.

On that same day Jeffrey emailed Kucala the final draft of the modified Single Party Instructions. The instructions provided that First American would create escrow number NCS-435-432-SF and that Tribeca would deposit $1 million. Jeffrey emailed the final version of the instructions with Faidi's signature at 6:56 p.m. The document was countersigned the same evening by Kucala on behalf of First American, and is the contract that underlies this appeal.[9] When Kucala signed the document, she was still unaware of Grishin's existence or his role in any proposed transaction.

Also on that same day, Faidi asked Jeffrey to move the First American escrow funds to a different institution. At trial, he did not recall why he asked her to do so.

## VIII. *Kucala Learns Grishin Was the Actual Depositor*

On May 11, 2010, Smith contacted Kucala regarding the status of the escrow funds. She was very surprised because she thought the funds had originated from Tribeca. She checked with her accounting department to get a copy of the April 5, 2010

---

[8] Smith reportedly stated that SGSF had only $16 million to contribute.

[9] Jeffrey and Faidi testified that Kucala did not provide them with a fully executed copy, and that they only obtained the version signed by Kucala through discovery in this litigation.

8

incoming wire notification. She had not reviewed this document before. She then realized for the first time that the transfer receipt created by Bennett had mistakenly identified Tribeca as the depositor.

On May 12, 2010, Kucala left Jeffrey a voicemail message saying that she had received a call from Smith who asked if the $1 million was still in escrow. She asked Jeffrey if the escrow instructions needed to be modified to require Grishin's signature. Jeffrey responded via email, indicating there was no need to vary the instructions because the money was going to be wired out of the account that day. Kucala replied that because the funds were received from Grishin, First American would need a third party instruction signed by him before it could transfer them. She attached a copy of a proposed instruction for Grishin to sign, and asked if he was an investor. Kucala also asked if the parties had a partnership agreement, and Jeffrey said they did. Kucala replied: "I can defer as long as a copy of the partnership agreement between [Faidi] and [Grishin] is forwarded for our review." Jeffrey understood her to mean that after it reviewed the partnership agreement First American would be able to rely on it in lieu of a third party instruction from Grishin. Jeffrey sent Kucala an electronic copy of the JVA, including Exhibit B.

Jeffrey also sent wiring instructions asking First American to wire the $1 million to an account held by Sky Pacific. According to Jeffrey, Kucala responded that she could not send the wire to an account belonging to Sky Pacific, but could send it to a bank account in the name of the partnership. Jeffrey sent revised instructions asking First American to wire the money to an account held by Sky Group. Later that afternoon, Kucala said she could not comply with the Sky Group instructions either because the money belonged to Grishin.

Jeffrey then decided to take hard copies of the JVA and Exhibit B to First American's office that afternoon to meet Kucala in person and clarify that the funds were not Grishin's, but instead belonged to the partnership. Rusky joined the meeting and both he and Kucala testified that Jeffrey was in an agitated state. Jeffrey testified she was assured the funds would not go anywhere until all parties came to an agreement. Kucala

9

and Rusky denied telling Jeffrey that the money would not be released without joint instructions.

Kucala testified that after she reviewed the JVA, she noted the funds had come from Grishin's personal account, not from his LLC. She and Rusky determined they could not forward the money to a Sky Group account because the money did not belong to Tribeca. She proposed adding the following language to Tribeca's Sky Group instructions: "The undersigned depositor hereby authorizes escrow agent to disburse funds in accordance with the above escrow instruction." Had Grishin signed this, Kucala would have been able to use the second set of Tribeca's instructions to disburse the money to Sky Group. She emailed Smith a request for Grishin to sign the third party authorization, but she never received a response. Kucala denied ever telling Jeffrey that the JVA would suffice in lieu of a third party instruction signed by Grishin.

Earlier that day, May 12, 2010, Jeffrey was copied on an email message from Smith asking for more information on the valuation of the properties in the J.E. Roberts Note portfolio. In the message, Smith asked Faidi for the written escrow instructions Grishin would need to sign to transfer the $1 million into an acquisition account. Jeffrey did not send Smith the valuation information until May 24.

Faidi met with Smith and others associated with Sky Group on May 13 and 14, 2010. They discussed strategies to raise funds to bridge the difference between the $16 million Grishin could contribute and the $47 million needed to buy the J.E. Roberts Note. Faidi ultimately concluded it would not be possible to arrange financing on such short notice. However, he asked J.E. Roberts for an extension of time to close the deal. Sky Group never placed a deposit on the transaction.

## IX.  *The Escrow Funds Are Disbursed to Grishin*

On May 24, 2010, Jeffery provided Smith with the valuations that he had requested two weeks prior. That same day, Grishin sent Faidi an email message informing him that he (Grishin) did not want to go forward with any deals. In Faidi's view, Grishin's withdrawal meant the $1 million that First American was holding in escrow transmuted into liquidated damages belonging to Sky Pacific.

10

Smith contacted Kucala and asked her to wire the funds in escrow to an account at the Bank of New York. He gave her instructions signed by Grishin directing First American to return the funds. First American verified that the account number associated with the Bank of New York was the same one from which the wire transfer had originated. Kucala wired the money to Grishin's account that afternoon on Rusky's advice. While Tribeca had created the First American escrow account, Rusky reasoned Grishin controlled the funds therein because he was the depositor. The day after the funds were returned to Grishin, Tribeca's attorney called Kucala and threatened to sue First American.

On June 18, 2010, Faidi contacted Smith and told him SGA owed Tribeca $1 million in liquidated damages. Neither Smith nor Grishin ever responded to his demand. Subsequently, Grishin sent Faidi a check in the amount of $67,776 to cover the operational expenses incurred by Sky Group.

## X.     *This Lawsuit Is Filed*

On February 22, 2011, Tribeca filed a complaint against First American alleging causes of action for breach of contract, breach of fiduciary duty, negligence, fraud, and negligent misrepresentation.

On February 24, 2012, Tribeca and Sky Pacific filed a third amended complaint (TAC), naming as defendants SGSF, SGA, SG Companies, Grishin, and First American. The TAC asserts the same five causes of action against First American as the original complaint. Prior to trial, Tribeca settled all of its claims against the four other defendants and dismissed them from the action, leaving First American as the sole remaining defendant.[10]

On March 29, 2013, the trial court filed its order granting First American's motion for summary judgment on all claims as to Sky Pacific, concluding Sky Pacific was a stranger to the subject escrow and could not prevail on any of the claims asserted in the TAC. The court denied First American's motion as to Tribeca, holding "[t]here remains

---

[10] Faidi reportedly received a $400,000 settlement from Grishin.

11

an issue for the trier of fact whether the $1,000,000 transmitted into Tribeca's escrow by a third party prior to the creation of the escrow agreement referencing deposited funds constituted funds 'deposited by' Tribeca within the meaning of the agreement given all the circumstance[s] of the case."

On September 19, 2013, the trial court appointed Hon. William J. Cahill (Ret.) as referee under Code of Civil Procedure section 638 to hear and determine all of the issues of fact and law.

## XI. *Expert Testimony*

During the trial, Tribeca's expert witness, Judi Souza, testified on the standard of care applicable to the handling of escrows. She opined that First American fell below the standard of care when it accepted wired funds from a party who did not appear to have any interest in the escrow. It also should have investigated why Grishin's money was earmarked for this escrow when the instructions identified Tribeca as the depositor. Additionally, once the dispute over the funds became apparent, First American should have halted all activity and either attempted to get the parties to agree or initiated an interpleader action. While an interpleader might have been costly to the parties, here the option was not offered at all. Instead, the money was disbursed to Grishin without Tribeca's consent, which also fell below the standard of care. An escrow company should not be the one to decide who is entitled to disputed funds. In this case, that determination should have been made by a court.

On cross-examination, Souza stated that "holding escrows," her term for the type of escrow used in this case, are unusual. In her 20 years of escrow practice, she had only handled between 25 to 40 similar escrows. She also agreed that while there is always the potential for conflicting interests in bilateral escrows, a conflict is less likely in holding escrows because there is only a single principal. She acknowledged the JVA did not authorize Tribeca to open the escrow. Instead, Sky Pacific should have signed the escrow instructions.

Charles Hansen testified as an escrow expert for First American. He opined that escrow agents do not owe a fiduciary duty to third parties. Typically, there are two

12

escrow principals: in a sale escrow, the seller and the buyer; in a loan escrow, the borrower and the lender. An escrow can also be a three-principal escrow, where you have a seller, a buyer who is also a borrower, and a lender who pays the seller. Thus, the classic escrow structure is either two principals or three principals. The escrow agent owes a fiduciary duty to all of the principals. The way to identify the principals is to identify who has the right to instruct. Typically, if a party is neither a borrower, a secured lender, a buyer, nor a seller, then that party is not a principal. Escrow agents are dual agents in the sense that they normally serve two masters. They have to act carefully because there are many ways an escrow can be abused. Because of this dual agency role, escrow instructions must be clear and not ambiguous.

Hansen testified that a "single party escrow" is not a true escrow, but is more like an agency because there is only one principal. In such arrangements, the escrow agent must follow the instructions of the principal. In the escrow at issue in the present case, however, First American would have been correct in viewing Grishin as a third party. The customary treatment of funds received from any party, including a third party, is that there is no change of ownership when the funds come into escrow. Instead, change of ownership occurs at the close of escrow.

Without Grishin's authorization, an escrow agent such as Kucala could not treat the funds as belonging to Tribeca. An escrow agent's standard of conduct is to follow the escrow instructions to the extent that one can lawfully do so. If a third party's money is contained in an escrow and that party has not given the agent permission to transmit the money to somebody else, the escrow principals cannot empower the agent to do something that they themselves cannot do. Therefore, even if Kucala had been aware of Exhibit B, without evidence of written approval for the purchase of Sky Group's prospective investment, the money would still be fully refundable to Grishin under the terms of the JVA.

In Hansen's opinion, First American had no other choice but to return Grishin's money when he demanded it. He disagreed with Souza's view that an interpleader would

13

have been appropriate. According to him, there were no conflicting claims of the type that would either require or even justify filing an interpleader action.

## XII.	*Statement of Decision*

On May 8, 2014, the trial court filed its statement of decision. The court found against Tribeca as to the entire complaint.[11]

On June 9, 2014, the trial court entered judgment. This appeal followed.

## DISCUSSION

## I.	*Standard of Review*

" 'In general, in reviewing a judgment based upon a statement of decision following a bench trial, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]" [Citation.] In a substantial evidence challenge to a judgment, the appellate court will "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]" [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment.' " (*Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 765, quoting *Estate of Young* (2008) 160 Cal.App.4th 62, 75–76.)

## II.	*Tribeca Failed To Prove Its Entitlement to Damages*

### A. *Legal Principles*

As noted above, Tribeca alleged claims against First American for breach of contract, breach of fiduciary duty, negligence, fraud, and negligent misrepresentation. In its statement of decision, the trial court concluded Tribeca failed to prove First American's handling of the escrow caused any damage to Tribeca. We concur.

---

[11] The trial court also ruled against First American as to a cross-complaint it had filed. That ruling has not been appealed.

An essential element of each of these claims is that a defendant's alleged misconduct was the cause in fact of the plaintiff's damage. (See Civ. Code, §§ 1709, 3300, 3333; Rest.2d Contracts, § 347; Rest.2d Torts, §§ 546, 766; *St. Paul Fire & Marine Ins. Co. v. American Dynasty Surplus Lines Ins. Co.* (2002) 101 Cal.App.4th 1038, 1060 [breach of contract]; *Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 182 [breach of fiduciary duty]; *Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 480 [negligence]; *Goehring v. Chapman University* (2004) 121 Cal.App.4th 353, 364 [fraud]; *Home Budget Loans, Inc. v. Jacoby & Meyers Law Offices* (1989) 207 Cal.App.3d 1277, 1285 [negligent misrepresentation].)[12]

The causation analysis involves two elements. " 'One is *cause in fact*. An act is a cause in fact if it is a necessary antecedent of an event.' [Citation.]" (*Ferguson v. Leiff, Cabraser, Heimann & Bernstein LLP* (2003) 30 Cal.4th 1037, 1045, italics in original.) The second element is proximate cause. " '[P]roximate cause "is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct." ' " (*Ibid.*) For purposes of this case, we address only the first element, cause in fact. (See *Viner v. Sweet* (2003) 30 Cal.4th 1232, 1235, fn. 1.)[13]

Determining whether a defendant's misconduct was the cause in fact of a plaintiff's injury involves essentially the same inquiry in both contract and tort cases. (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 909 (*US Ecology*); *Vu v. California Commerce Club, Inc.* (1997) 58 Cal.App.4th 229, 233.) "The test for causation in a breach of contract . . . action is whether the breach was a substantial factor

---

[12] Generally, a plaintiff who proves a "breach of duty" (including breach of contract) but fails to show any "appreciable detriment"—i.e., damages—nevertheless "may . . . recover" nominal damages and, when appropriate, costs of suit. (Civ. Code, § 3360; see *Sweet v. Johnson* (1959) 169 Cal.App.2d 630, 632–633.) Tribeca has made no argument that it might have been entitled to nominal damages and costs, and therefore has forfeited any such contention.

[13] Courts sometimes refer to cause in fact as "but for" causation. (See *Viner v. Sweet, supra,* 30 Cal.4th at pp. 1239–1240.)

in causing the damages." (*US Ecology*, at p. 909.) Similarly, in tort cases, "California has definitely adopted the substantial factor test . . . for cause-in-fact determinations. [Citation.] Under that standard, a cause in fact is something that is a substantial factor in bringing about the injury." (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968–969; see also *Strebel v. Brenlar Investments, Inc.* (2006) 135 Cal.App.4th 740, 752 [approving substantial factor jury instruction in fraud action]; *Stanley v. Richmond* (1995) 35 Cal.App.4th 1070, 1095 [applying substantial factor test in breach of fiduciary duty action].)

### B. Application

Tribeca's claim of damages is based entirely on its contention that First American's failure to transfer the escrow funds pursuant to its instructions, and to instead refund the money to Grishin, caused Faidi to lose the $1 million in liquidated damages. This contention necessarily assumes Tribeca was Sky Pacific's agent and that Sky Pacific was entitled to liquidated damages under the JVA at the time Tribeca requested the transfer. It also assumes that Sky Pacific, if it was entitled to such damages, was entitled to obtain them from the subject escrow account.[14]

#### 1. Grishin Did Not Lose Title To His Funds

The trial court found Tribeca failed to prove damages, concluding Grishin never lost title to the $1 million, even after he wired the money to First American. On appeal, Tribeca claims the court "utterly failed to acknowledge that Grishin did not deposit the funds of his own volition or pursuant to his own transaction, but rather as part of his participation in the joint venture." It relies on the proposition that property contributed to a joint venture "becomes property of the partnership and the contributor no longer has exclusive title or control." Significantly, this argument overlooks the fact that Grishin was not a party to the JVA. Rather, Grishin's entity—SGSF—was the member of Sky Group, and the disputed funds were deposited by Grishin, not by SGSF. Moreover, we

---

[14] This second condition is problematic, as the trial court previously ruled on summary judgment that Sky Pacific was a stranger to the subject escrow, a finding that has not been challenged on appeal.

disagree that the money was *contributed* to a joint venture because, as the trial court noted and as Tribeca concedes, the members of Sky Group had *not* agreed to acquire any specific investment at the time the deposit was made.

## 2. Tribeca Was Not Entitled To Liquid Damages

The trial court also found Tribeca could not recover against First American because the JVA's liquidated damages provision inured to the benefit of Sky Pacific only, and because First American was not a party to the JVA. Tribeca counters both that the liquidated damages provision may not be interpreted to benefit First American's position in this litigation, and that the provision is enforceable by Tribeca as the agent/assignee of Sky Pacific. Again, it is unclear how Tribeca, as an agent, could have any greater right to liquidated damages than Sky Pacific, the actual party to the JVA that the trial court had already determined had no claim against First American. Additionally, while Tribeca asserts "the agreement between Grishin and Mr. Faidi was that the money would be available to Tribeca as liquidated damages if the SGA member pulled out of a transaction after giving approval," the plain language of the JVA clearly conveys that neither Tribeca, nor Grishin, nor Faidi were parties to the agreement.[15] They are not identified by name, and no express duties or obligations are assigned to them.

Further, as the trial court correctly noted, Tribeca did not prove the liquidated damages provision had been fully triggered by Grishin's conduct. For example, Tribeca

---

[15] We note Tribeca's arguments, which are essentially Faidi's own arguments, are unavailing precisely because Faidi chose to conduct his business through the various entities that he created. As he testified, a single purpose entity such as Sky Pacific "has the benefits of tax pass-through advantage and yet provides limitation of liability." While it is true that the proposed J.E. Roberts transaction, in reality, represented a deal between Faidi and Grishin, they both agreed to conduct their business through their limited liability companies and are bound by the legal consequences of that decision. Tribeca blurs this line, appearing to put a novel (though legally unsupportable) spin on the alter ego doctrine. A corporation is ordinarily regarded as a legal entity, separate and distinct from its shareholders, officers, and directors. (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538.) Under the alter ego doctrine, however, a court may disregard a corporate identity "where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation." (*Ibid.*)

17

failed to show SGSF approved the J.E. Roberts transaction consistent with the JVA, which requires such approvals to be evidenced in writing. Exhibit B provides that "[u]pon presentation of a prospective Investment to the Company, Tribeca Member will notify SGA Member in writing of the deadline . . . for SGA Member to review and make a determination as to *whether to approve or disapprove* the acquisition by the Company of such Investment *(as provided in Section 6.6(c) of the* [*JVA*])." (Italics added.) Under Exhibit B, SGSF's deposit would only become nonrefundable following the approval of an investment.

Section 6.6(c) of the JVA falls under the section entitled, "Major Decisions," and states, in part: "The following material decisions regarding the management and control of the Company shall be made by the unanimous vote of the Members: [¶] . . . [¶] (c) Proceeding with the acquisition of any Investment or not proceeding with the acquisition of any Investment. . . ." Section 12.3 of the JVA further provides, in part: "*All notices, approvals, consents, and other communications* hereunder *shall be in writing* and be deemed given when delivered by hand, when deposited with a reputable next business day delivery service providing receipt of delivery (such as FedEx) for delivery the following morning, when sent by facsimile transmission with electronic written confirmation of receipt and with delivery of an original thereafter by any other method permitted by this Section 12.3 in any case addressed to the parties hereto at their addresses set forth below or to the Company care of both Members. . . . *Such notice shall be made a permanent part of the Company records.*" (Italics added.) The record contains no evidence of a written approval from SGFA to proceed with the J.E. Roberts transaction.

Nor does it appear Tribeca itself would have been authorized to collect liquidated damages under the JVA even if the provision authorizing those damages had been in play. Not only is Tribeca not a party to the JVA, it failed to prove it qualified as Sky Pacific's designated affiliate under that agreement. Section 6.2(a) provides: "Subject to the terms of this Agreement *and the review and prior reasonable approval of such delegation by SGA Member*, the Manager may, at any time, *delegate* any of its powers,

18

duties and responsibilities *to an Affiliate* of the Manager. Any delegation pursuant to this Section 6.2 shall not, however, relieve the Manager of any of its obligations hereunder." (Italics added.) There is no evidence that SGSF ever approved the delegation of any duties from Sky Pacific to Tribeca.

Even if Tribeca was deemed an affiliate of Sky Pacific, it does not appear that Sky Pacific would have been entitled to liquidated damages even if it had been a party to the First American escrow. Section 3.2 of the JVA provides, in part: "[W]ith respect to any Investment which the SGA Member and the Tribeca Member approve for acquisition, the escrow deposit provisions set forth in Exhibit B attached hereto shall be followed." (Emphasis omitted.) Again, the only evidence that SGSF approved the J.E. Roberts investment is a conference call between Faidi, Smith, and various other persons. Grishin was not involved in that phone conversation and the record contains nothing in writing indicating that SGSF formally approved the proposed J.E. Roberts investment.

Additionally, it does not appear that the liquidated damages provision was triggered. We note section 6 of Exhibit B provides: "Following approval of the acquisition of an Investment, the SGA Member shall make the contributions with respect to such Investment required pursuant to Section 3.2 of the Agreement. If the SGA Member *fails to make any such required contribution,* then the Initial Deposit shall be immediately released to the Tribeca Member as liquidated damages." (Italics added.) Here, SGSF was not required to make any contributions prior to First American's decision to return the $1 million dollars to Grishin because, at that time, Sky Group had not entered into a contract to purchase the J.E. Roberts note. As Sky Group never had a contract to purchase the J.E. Roberts note, SGSF never had the opportunity to fail to make any "required contribution" towards that transaction.

Finally, it is undisputed that the escrow provisions contained in the JVA were not followed in this case. Again, section 3.2 of the JVA provided that "the escrow deposit provisions set forth in Exhibit B . . . shall be followed." (Emphasis omitted.) The Single Party Instructions entered into by Tribeca and First American differ from those set forth

19

in Exhibit B in many significant respects, not the least of which is that neither party to the JVA is mentioned therein by name.

Again, Tribeca would have us ignore the language of the JVA, asserting First American is barred from using the contract "as a shield against liability for its own breach of contract, breach of fiduciary duty, and/or negligence" because First American is not a party to the JVA. It cites to no authority for that proposition. Indeed, Tribeca's entire claim is premised on the JVA, as it is that agreement that prompted Grishin to transfer $1 million in the first place. It would be unfair to allow Tribeca to use the JVA as a sword to support its claim for damages, while not also allowing First American to challenge Tribeca's right to recover those damages under that same contract.

### 3. *The Escrow Account Did Not Give Tribeca Control Over Grishin's Money*

Even if Tribeca were entitled to recover liquidated damages under the JVA, such damages would not have been recoverable from the First American escrow account because, again, Grishin maintained ownership over those funds. We are not persuaded that Tribeca obtained title to Grishin's funds merely by its having set up the account in which the $1 million was housed. Financial Code section 17003, subdivision (a) defines an escrow as "any transaction in which one person, for the purpose of effecting the sale, transfer, encumbering, or leasing of real or personal property to another person, delivers any written instrument, money, evidence of title to real or personal property, or other thing of value to a third person to be held by that third person *until the happening of a specified event or the performance of a prescribed condition,* when it is *then* to be delivered by that third person to a grantee, grantor, promisee, promisor, obligee, obligor, bailee, bailor, or any agent or employee of any of the latter." (Italics added.) Again, at no time after the account was created did Sky Group commit to purchasing the J.E. Roberts Note. Thus, consistent with Hansen's testimony, no event transpired that would have divested Grishin of title to his escrowed funds.

Courts have held "[t]he deposit of moneys in the escrow does not alter or change the ownership thereof." (*People v. Hess* (1951) 104 Cal.App.2d 642, 681.) First

20

American held Grishin's money in trust for his benefit, and no other party had any claim to his funds because he never designated another party as the beneficiary. (See *Hildebrand v. Beck* (1925) 196 Cal. 141, 145–146.) Because Grishin retained ownership, he was entitled to withdraw the money regardless of whether another party contended he was liable in damages for failure to consummate a transaction. (*Hastings v. Bank of America* (1947) 79 Cal.App.2d 627, 629; see *Crooks v. State Bar* (1970) 3 Cal.3d 346, 357 ["It is established law that on failure of escrow the funds deposited with the escrow holder are returnable to the respective depositors."].) Tribeca could not assert entitlement to the funds in escrow except upon the terms stipulated in the depositing party's instructions. (*Kellogg v. Curry* (1951) 101 Cal.App.2d 856, 860–861.) Grishin never provided any instruction to First American, other than the one requesting it to return his funds "immediately."

Additionally, the trial court found that First American could not ignore Grishin's rights simply because he was a stranger to the single party escrow, citing to Civil Code section 2344: " 'If an agent receives anything for the benefit of his principal, to the possession of which another person is entitled, he must, on demand, surrender it to such person . . . and is responsible therefor, if, after notice from the owner, he delivers it to his principal.' " Tribeca claims First American's sole duty was to Tribeca, as the only other party to the escrow. However, it cites to no legal authority for the proposition that an escrow agent may disregard the rights of a third party whose property is lodged in a stranger's escrow account.

Citing to *Weiner v. Roof* (1942) 19 Cal.2d 748, 752, Tribeca asserts First American was only obligated to Grishin if it continued to hold the funds, and that "if it released the funds to Tribeca or otherwise in accordance in the escrow instructions, it would have been released from liability." The passage it relies on from *Weiner* states the rule that "one who has paid money through fraud or mistake to an innocent agent, may recover the amount from the agent unless the latter has paid it to the principal, spent it on behalf of the principal, or paid it to a third party on behalf of the principal." As First American notes, Grishin did not wire his money to First American through fraud or

mistake. It is undisputed that he intended the money to be held while he considered whether to proceed with Sky Group's proposed investment. We also agree Tribeca has no cause to complain that First American chose not to evade its clear responsibility to Grishin by shuttling his deposit before he could act to protect himself.

Tribeca also asserts that because Grishin referenced the term "staggered escrow account" in his wire transfer, he must have intended to place his funds under Tribeca's control. According to Tribeca, once he deposited the funds into the escrow account designated in the Single Party Instructions, it was "no longer 'his money,' " relying on *In re Incomnet, Inc.* (9th Cir. 2006) 463 F.3d 1064, 1070 (*Incomnet*).) Tribeca asserts this federal case stands for the proposition that "a party has 'dominion' over funds when the party has the right to use the money however it wished." The case is manifestly inapposite.

*Incomnet* is a federal bankruptcy law case. In that case, the Ninth Circuit affirmed a bankruptcy appellate panel's decision deeming an entity holding payments made by a bankruptcy petitioner to be a transferee under 11 United States Code sections 547 and 550 pursuant to the judicially created "dominion" test. (*Incomnet*, *supra*, 463 F.3d at p. 1066.) In that case, a committee of unsecured creditors sought to recover federally mandated universal service support contributions that had been paid by a telecommunications services provider within 90 days prior to the filing of the service provider's bankruptcy petition. (*Id.* at pp. 1066–1068.) The nonprofit entity designated to receive and disburse the contributions contended it was not a transferee under the bankruptcy statute, but was instead a "mere conduit for the funds." (*Id.* at pp. 1067–1068.) In finding that the entity was a transferee, the court applied the "dominion test" under which " 'a transferee is one who . . . has "dominion over the money or other asset, the right to put the money to one's own purposes." ' " (*Id.* at p. 1070.)

The case before us does not concern federal bankruptcy statutes. And *Incomnet*, *supra*, 463 F.3d 1064, did not address the law concerning escrow accounts. Therefore, that case does not establish precedent for Tribeca's position. (See *DCM Partners v.*

22

*Smith* (1991) 228 Cal.App.3d 729, 739, fn. 7 [case cannot stand for a proposition neither discussed nor analyzed].)

In sum, the trial court found Tribeca was not entitled to damages in connection with First American's decision to refund Grishin's money. We find this conclusion is fully supported by the law and by substantial evidence. But even if we found Tribeca had proved the damages element, we would still affirm the lower court's judgment as to each of Tribeca's claims.

## IV. *Breach of Contract*

### A. *Contentions*

Tribeca asserts the trial court erred in finding it did not prove its claim for breach of contract against First American. The elements of a cause of action for breach of contract are " '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff.' " (*Bushell v. JPMorgan Chase Bank, N.A.* (2013) 220 Cal.App.4th 915, 921.)

" 'An escrow involves the deposit of documents and/or money with a third party to be delivered on the occurrence of some condition.' [Citations.] An escrow holder is an agent and fiduciary of the parties to the escrow. [Citations.] The agency created by the escrow is limited—limited to the obligation of the escrow holder to carry out the instructions of each of the parties to the escrow. [Citations.] If the escrow holder fails to carry out an instruction it has contracted to perform, the injured party has a cause of action for breach of contract. [Citation.]" (*Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705, 711 (*Summit*).)

In addition to the failure to prove damages, the trial court concluded First American did not breach the escrow contract when it refused to comply with Tribeca's instructions to wire the $1 million out of escrow and into bank accounts controlled by Faidi, because the Single Party Instructions did not give Tribeca the right to control Grishin's deposit. The court noted even Souza conceded First American had acted properly by refusing to comply with Tribeca's wiring instructions because the transfer had not been approved by Grishin, who was the actual depositor of the funds. The court

also found First American did not breach the contract by declining to interplead the funds following Grishin's demand for their return.

**B.    *The Single Party Instructions Did Not Apply to Grishin's Money***

In its statement of decision, the trial court found "[t]he most reasonable interpretation of the Single Party Instructions . . . is that they applied only to funds *deposited by Tribeca* as 'Depositor' and *did not* entitle Tribeca to control the disposition of funds deposited by nonrelated third parties, including Tribeca's third party investor, Sergey Grishin."[16]  (Italics added.)  On appeal, Tribeca asserts: "Factually, it is clear that *Tribeca* deposited the funds into escrow."  (Italics added.)  This assertion is derived from a tortured interpretation of both the parties' contract and the underlying facts.

When an appellant challenges a trial court's interpretation of a written contract, the substantial evidence standard of review applies when the contract is ambiguous and conflicting extrinsic evidence is admitted to assist the court in interpreting the contract. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866.)  However, if interpretation of the contract does not turn on the credibility of conflicting extrinsic evidence, the trial court's interpretation of the contract is a question of law we review de novo, or independently.  (*Ibid.*; *Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 604; *Burch v. George* (1994) 7 Cal.4th 246, 254.)

"A contract must be interpreted so as to give effect to the mutual intent of the parties.  [Citation.]  The terms of a contract are determined by objective rather than subjective criteria.  The question is what the parties' objective manifestations of agreement or objective expressions of intent would lead a reasonable person to believe."

---

[16] It is undisputed that Tribeca and First American entered into an escrow contract under the Single Party Instructions, which identify Tribeca as the "Depositor" and First American as "Escrow Agent."  Section 1 of the document provides: "Depositor and Escrow Agent have agreed that the sum of $1,000,000.00 (the 'Escrowed Funds') be deposited by Depositor with Escrow Agent for subsequent disbursement upon the terms and conditions set forth in these Instructions."  The contract states that First American will follow Tribeca's instructions with respect to the disposition of the funds held in escrow account number NCS-435-432-SF.  Nothing in the instructions indicates that the deposit would originate from any party other than Tribeca.

24

(*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632.) Accordingly, "[t]he parties' undisclosed intent or understanding is irrelevant to contract interpretation." (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956.)

" 'When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . . .' " (*WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1709.) "The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties." (*Morey v. Vannucci* (1998) 64 Cal.App.4th 904, 912.)

The trial court found the most reasonable interpretation of the Single Party Instructions, based on their plain wording and the circumstances surrounding their negotiation, was that they applied only to funds deposited by Tribeca as the designated "Depositor" and not to funds deposited by third party investors such as Grishin. In particular, the instructions did not include funds that Tribeca might "cause" others to deposit. Instead, the instructions explicitly refer to funds that *Tribeca itself* was to deposit as the designated "Depositor," and further identified Tribeca as the depositing party by including Tribeca's identification number and business address. Based on this interpretation, the court concluded Tribeca did not deposit any funds on which the Single Party Instructions could operate and, as a result, the instructions did not govern First American's handling of Grishin's funds. We agree.

As Tribeca notes, the function of the court is to "give effect to the mutual intention of the parties as it existed at the time of contracting, so far as it is ascertainable and lawful." (See Civ. Code, § 1636.) Substantial evidence in the form of the conduct of the contract negotiations supports the trial court's view that the parties did not mutually intend for the contract to apply to Grishin's deposit. While it is true First American had actual notice that the funds were deposited by Grishin, his wire transfer arrived more than

25

a month before the Single Party Instructions were executed.[17]  It is undisputed that Kucala, the primary contract negotiator on behalf of First American, did not become aware of Grishin's identity until after the escrow contract was fully executed.[18]  While the evidence is conflicting, substantial evidence in the form of Kucala's testimony supports a finding that during the lengthy negotiations over the content of the Single Party Instructions, Tribeca never told First American the subject escrow would hold third party funds, or that the escrow would be used to implement provisions of a joint venture agreement between Sky Pacific and SGSF, both strangers to the escrow contract.

Further, throughout its briefing Tribeca muddles the facts by repeatedly misidentifying itself as "the agent for the joint venture" and "the managing member of the joint venture between Tribeca and Grishin."  It also claims it was "acting as the authorized agent" of the joint venture with respect to the escrow, although there is no evidence in the record that SGSF authorized such agency in writing, as required by the JVA.  Tribeca also erroneously states that the JVA was "between Grishin and Tribeca." Again, the JVA was between Sky Pacific and SGSF, and Sky Pacific, not Tribeca, was the "managing member" of the Sky Group.

In addition to wrongly asserting that it occupied the position of Sky Pacific with respect to the JVA, Tribeca also appears to appropriate Grishin's identity on appeal, claiming "it is clear" that *Tribeca* was the actual depositor of the funds because it "*caused the funds to be deposited*" by Grishin into the escrow account.  Again, there is no evidence that Sky Pacific, SGSF, or Grishin ever formally authorized Tribeca to do anything with respect to the JVA.  While it is true that Faidi owns both Tribeca and Sky

---

[17] While Tribeca strongly argues First American cannot rely on Bennett's mistaken receipt of Grishin's funds, there is nothing in the Single Party Instructions themselves that would cause a transmutation of ownership from Grishin to Tribeca.

[18] It is understandable that Kucala would not have suspected a third party's involvement, given that the earlier USB transaction, also negotiated by Jeffrey and Kucala, concerned a holding escrow in which Tribeca had placed its own funds.  While we agree with Tribeca that Bennett's mistake in receipting the deposit may not be grounds for rescinding the escrow contract, the circumstance of the mistake is still relevant in understanding First American's contractual intent.

26

Pacific, he made the decision to create them as distinct and separate business entities. Having chosen to conduct business in this manner, we are not inclined to accept his legal arguments that ignore the corporate boundaries he himself created.

Tribeca's other legal arguments also are not persuasive. In asserting that the trial court erred in finding Grishin retained control over the deposit, Tribeca attempts to draw an analogy to direct deposits made by employers into employee bank accounts. It contends "[i]f the law was that a depositor of funds into the account of a third party retained control of those funds, the entire 'direct deposit' system would fail because employees would be unable to access those funds without express written consent from their employer every time they made a withdrawal or wrote a check." This analogy is manifestly flawed.

As First American correctly observes, in Tribeca's banking scenario the deposits are made for the personal use and benefit of the recipient account holder. Here, there is no evidence that Grishin wired his $1 million to First American for Tribeca's use or benefit. Nor does the evidence show he intended to relinquish control. It is undisputed that he never submitted any written instruction allowing First American to transfer his deposit to someone else.[19] If he had intended to relinquish title to Tribeca, he could simply have wired the money into Tribeca's own bank account.

Tribeca asserts the term "depositor" is ambiguous because Jeffrey and Kucala ascribed different meanings to it, with Jeffrey believing the term encompassed funds deposited by an investor. Her interpretation, however, was derived not from the word itself, but rather from her own subjective knowledge of the circumstances surrounding the transaction. As a matter of law, we do not find the term to be ambiguous, in and of itself. We therefore also reject Tribeca's contention that, because First American drafted

---

[19] In asserting Grishin lost any contractual rights to the funds in the escrow once he made the deposit, Tribeca states—without citation to the record— that "[o]n May 8, 2010, Mr. Grishin submitted an instruction to [First American] to deposit the funds into escrow NCS-435-432-SF." We have reviewed the record and find no evidence of such an instruction.

the offer, any ambiguity in the offer should be construed against it pursuant to Civil Code section 1654, which provides: "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist."

Tribeca again attempts to stand in Sky Pacific's shoes, maintaining that it was the "agent for the joint venture." However, under the facts of this case, Tribeca's agency argument is further barred by the equal dignities rule. In defining the authority of agents, Civil Code section 2309 provides, "An oral authorization is sufficient for any purpose, except that an authority to enter into a contract *required by law to be in writing* can only be given by an instrument in writing." (Italics added.) Because Tribeca was not a party to the JVA, under the explicit provisions contained therein it could only be authorized to execute the Single Party Instructions as an agent of Sky Pacific *if* it had so authorized SGSF in writing. (See *McGirr v. Gulf Oil Corp.* (1974) 41 Cal.App.3d 246, 254–255.) Again, no evidence of such written authorization appears in the record.

## V. *Negligence and Breach of Fiduciary Duty*

"The elements of a cause of action for negligence are (1) a legal duty to use reasonable care, (2) breach of that duty, and (3) proximate cause between the breach and (4) the plaintiff's injury." (*Mendoza v. City of Los Angeles* (1998) 66 Cal.App.4th 1333, 1339.) " 'The elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach.' " (*Gutierrez v. Girardi* (2011) 194 Cal.App.4th 925, 932.) The breach of fiduciary duty can be based upon either negligence or fraud, depending on the circumstances. (See *Salahutdin v. Valley of California, Inc.* (1994) 24 Cal.App.4th 555, 563; see also *Federal Deposit Ins. Corp. v. McSweeney* (S.D.Cal. 1991) 772 F.Supp. 1154, 1157.)

An "agency created by the escrow is limited—limited to the obligation of the escrow holder to carry out the instructions of each of the parties to the escrow." (*Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705, 711 (*Summit*).) "[N]o liability attaches to the escrow holder for [its] failure to do something

28

not required by the terms of the escrow or for a loss incurred while obediently following [the] escrow instructions." (*Lee v. Title Ins. & Trust Co.* (1968) 264 Cal.App.2d 160, 163.) "[A]n escrow holder 'has no general duty to police the affairs of its depositors'; rather, an escrow holder's obligations are 'limited to faithful compliance with [the depositors'] instructions.' [Citations.] Absent clear evidence of fraud, an escrow holder's obligations are limited to compliance with the parties' instructions." (*Summit, supra,* at p. 711.)

The trial court concluded First American was not negligent in its handling of the escrow deposit and did not breach any fiduciary duty owed to Tribeca. We agree.

Relying on *Summit, supra,* 27 Cal.4th 705, as well as additional authorities, the court observed, "An escrow holder's fiduciary duty is limited to compliance with the escrow instructions, which here did not apply to third party funds." The court also found that, contrary to Tribeca's allegations, the evidence did not support the argument that First American knew or should have known that the deposit was made, in part, to serve as liquidated damages.

Tribeca acknowledges the trial court found the escrow instructions did not encompass third party funds, but asserts the court failed to address its argument that First American had a duty—once it received the wire transfer—to promptly notify Tribeca of the need for a third party instruction. Tribeca relies largely on Souza's testimony that First American's conduct fell below the standard of care for an escrow holder. As we have summarized above, First American's expert witness testified that its conduct fell within the standard of care and that returning the money to Grishin was proper. The trial court apparently gave more credence to his testimony than to Souza's. Tribeca does not persuasively argue that the court erred in doing so. We find no error.

## VI. *Other Causes of Action*

Tribeca does not address the TAC's claims for fraud and negligent misrepresentation. Accordingly, any issues pertaining to these claims have been waived on appeal and we need not address them in this opinion.

29

## DISPOSITION

The judgment is affirmed.

_____
DONDERO, J.

We concur:


_____
HUMES, P.J.


_____
MARGULIES. J.

31

A142430

Trial Court:                               San Francisco County Superior Court

Trial Judge:                             Hon. William J. Cahill (Ret.)

Counsel for Appellant                Buchman Provine Brothers Smith LLP
    Horace W. Green

Humbert Law
    C. Mark Humbert

Counsel for Respondent              Boutin Jones Inc.
    Michael T. Fogarty