Filed 10/14/20  Vernon v. Culotti CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| JENNIFER VERNON, | B294867 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. SC120578) |
| v. | |
| ELAINE CULOTTI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Nancy L. Newman, Judge.  Affirmed in part; reversed in part with directions.

Law Offices of Steven Glaser and Steven Glaser for Plaintiff and Appellant.

Keleti Law and S. Martin Keleti for Defendant and Appellant.

_____

Elaine Culotti appeals from a judgment after a bench trial entered in favor of her former business partner Jennifer Vernon. Culotti and Vernon each owned 50 percent of the membership interests in House of Rock, LLC (HOR), a marketing company that promoted home furnishings by showcasing them in luxury homes owned by Briles-Culotti Partnership (BCP), in which Culotti was a partner. Culotti contends the trial court erred in finding she breached her fiduciary duties to Vernon by refusing to pay for furnishings donated by HOR's clients, instead claiming the furnishings were the property of BCP. Culotti argues further the judgment was based on inadmissible evidence and failed to include an offset for the rental value to HOR of the showcase home. Vernon also appeals from the judgment, contending the trial court erred in denying her request for prejudgment interest. We agree the trial court erred in denying Vernon's request for prejudgment interest. We reverse the judgment as to prejudgment interest and otherwise affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

A. *BCP Acquires the La Mesa Property*

Culotti is an interior designer and real estate developer experienced in renovating high-end residential properties for resale.[1] In October 2010 Culotti, her husband Gary,[2] and Greg Briles formed BCP to purchase, remodel, and sell a large estate

---

[1] The background facts are taken from undisputed facts in the trial court's statement of decision and trial court exhibits, except as noted.

[2] Because he shares a last name with Culotti, we refer to Gary Culotti by his first name.

located on La Mesa Drive in Santa Monica (La Mesa property). Their partnership agreement recognized Briles would contribute more than $7.8 million dollars toward the purchase of the La Mesa property, while the Culottis would contribute their efforts to design and manage the renovation. The Culottis would receive 25 percent of the profits from the sale of the property after payment of expenses and interest on Briles's investment.

Culotti and Briles testified the partners understood Culotti intended to use the renovated La Mesa property as a showcase for designers and manufacturers to display their furnishings and fixtures in a high-end setting in coordination with BCP's listing of the property. Culotti believed staging the house as a designer showcase would lead to a faster sale at a higher price than comparable properties. Renovations began in the summer of 2011 and were completed approximately one year later.

B. *Culotti and Vernon Form HOR*

Culotti and Vernon met at a party in September 2011. At the time Vernon was a senior vice-president for national sponsorships at Live Nation, a large events promotion company, and she had experience in sales, marketing, branding, sponsorship, and event services. Culotti and Vernon agreed to form a partnership that would use Culotti's showcase concept as a marketing platform to attract third party sponsorships. They named the business House of Rock because they initially planned to design the La Mesa property showcase with a rock and roll theme in a promotional partnership with Rolling Stone magazine.

Vernon and Culotti formed HOR as a limited liability company in January 2012, with each of them owning 50 percent of the membership interests. The HOR operating agreement

specified, "Culotti is to manage the banking and finances of the [c]ompany and to secure, purchase, design, remodel or build completely the residence being used for each show house," while "Vernon is to be the capital raising partner for any and all sponsors or partners of the [c]ompany or its events. . . . All advertisement, sales, and promotional packages shall be cultivated and vetted through . . . Vernon." The operating agreement provided the profits earned each fiscal year would be allocated to the members in proportion to their interest. In early 2012 Vernon quit her job at Live Nation, where she was earning a base salary of $600,000 per year, to focus on HOR.

HOR successfully secured sponsorships and promotional consideration from several dozen manufacturers and vendors, as well as event sponsors, who agreed either to pay cash to HOR or contribute goods and services for the decoration of the La Mesa property.[3] In exchange for their contributions, the vendors expected to receive promotion of their products and services through parties and charitable events held at the La Mesa property, as well as media and Internet exposure from those events and showings of the home.

HOR's standard agreements with the vendors provided any in-kind contributions from the vendors would "become the permanent property of Owner." "Owner" was defined as HOR in the first sentence of the agreements, but the agreements also stated, "Owner, as owner of the house located [on Mesa Drive] (the "House"), will extensively renovate, improve and decorate the House and will allow the House to be used for social events

---

[3]     For simplicity, we refer to the companies that made in-kind contributions as vendors.

and promotions . . . ." Elsewhere the agreements provided, "Owner is entering into separate arrangements with various vendors to provide goods and services to Owner in connection with the House." Yet BCP was not a party to any of the vendor agreements, which were all made with HOR. Each vendor was required to state the "approximate cash/retail value" of its in-kind contribution in an attachment to its agreement.

The in-kind contributions secured by HOR included bathroom plumbing and fixtures, home automation devices, ceramic tile, chandeliers, wood and stone flooring, and electronics. After the completion of the renovation, HOR hosted approximately 20 events at the La Mesa property between September 15 and December 6, 2012.

C.    *Vernon Sues Culotti, BCP, and Its Partners*

Vernon filed this action on April 13, 2013. The operative second amended complaint asserted 14 causes of action against Culotti, Gary, Briles, BCP, and HOR. Three causes of action proceeded to trial and are the subject of this appeal: a cause of action for breach of fiduciary duties against Culotti, and causes of action for unjust enrichment and quantum meruit against all defendants.[4]

The complaint alleged in relevant part that prior to forming HOR, Culotti failed to disclose to Vernon that Culotti was not the sole owner of the La Mesa property and Culotti's primary purpose in forming HOR was to increase the sales price of the La Mesa property to benefit BCP. As alleged, all of the goods and services

---

[4]    Vernon's other causes of action were either dismissed on summary adjudication, abandoned prior to trial (including derivative claims on behalf of HOR), or withdrawn at trial.

contributed by vendors became the assets of HOR, but on October 2, 2012 Culotti provided public testimony in which she acknowledged the purpose of HOR was to "flip" the La Mesa property and for BCP's partners to profit from the HOR assets. Vernon's prayer sought, among other things, a declaration Vernon was entitled to a share of the HOR assets consistent with her ownership interest in HOR, damages according to proof,[5] and "interest at the maximum legal rate." At the time the first amended complaint was filed, the La Mesa property was listed for sale for $18.9 million.[6]

D.    *Briles's Cross-complaint*

On April 16, 2015 Briles and BCP filed a cross-complaint against Vernon, the Culottis, and HOR.[7] Briles's operative first amended cross-complaint asserted causes of action for breach of

---

[5]    Although the complaint did not specify Vernon's monetary damages, it alleged HOR sustained damages in excess of $1.5 million as a result of Culotti's misconduct and conversion of HOR's assets.

[6]    There is no evidence in the record when, if ever, the La Mesa property was sold.

[7]    After relations among the BCP partners broke down, multiple lawsuits were filed. On August 27, 2014 Culotti filed a lawsuit against Briles and BCP. (*Culotti v. Briles et al.* (Super. Ct. L.A. County, 2016, No. SC123035) (*Culotti v. Briles*).) On April 10, 2015 Briles filed a lawsuit against the Culottis. (*Briles v. Culotti et al.* (Super. Ct. L.A. County, No. BC578528).) Both actions were deemed related to this action and assigned to Judge Newman. The court ordered the *Culotti v. Briles* action to arbitration, and on March 4, 2016 the court affirmed the arbitration award.

6

an oral or implied contract, fraudulent misrepresentation, equitable, comparative, and contractual indemnity, and contribution. The cross-complaint alleged Culotti and HOR entered into an agreement with BCP to use the La Mesa property for showcase events. Further, the cross-complaint alleged Culotti and HOR promised they would arrange for the installation of furnishings, decorations, and fixtures on the La Mesa property without cost to BCP, and those goods would be donations for which BCP had no financial obligation. The increased value to BCP from these improvements constituted consideration for BCP allowing HOR to use the La Mesa property rent free.

On April 27, 2017 Culotti filed a motion for summary adjudication as to Briles's cross-complaint, which the court later granted in part.[8] The motion was supported by Culotti's declaration in which she testified as to the *Culotti v. Briles* arbitration: "I previously asserted in an arbitration brief, filed in the La Mesa arbitration that I had 'made a $1,113,646 ["]in-kind["] contribution through fixtures provided by [HOR]. These contributions consisted of electronics, plumbing, fixtures, and other personal property contributed by third parties to the project that are now fixtures to be sold with the house, which have greatly enhanced the value of the [p]roperty. . . . Even if [Culotti] is not granted full credit for this ["]in-kind["] contribution, at the very least, [Culotti] should be granted a 50% credit as she was a

---

[8] The trial court granted summary adjudication in favor of Culotti on Briles's cross-claims for breach of contract and fraudulent misrepresentation. The court had earlier granted a motion for summary adjudication in favor of Culotti on Briles's cross-claim for contribution. Only Briles's indemnity claims proceeded to trial.

7

50% partner in HOR; accordingly, at a minimum, the in-kind contribution would be worth $556,823'." Culotti continued, "Except for the mathematical calculations contained within it, that statement . . . was based on my own personal knowledge, as to the types of 'in-kind' fixture contributions made by third parties, and upon my experience as a developer and interior designer as to the value such fixtures added to the La Mesa [p]roperty."

The $1,113,646 amount of "'["]in kind["]' contributions" Culotti stated in her declaration was the value of the products installed at the La Mesa property. The amount matched exactly the stated cost basis of HOR's assets in a draft depreciation schedule Vernon directed HOR's accountants to prepare in early 2013 in connection with the company's 2012 tax returns.[9]

E.    *The Evidence at Trial*

A bench trial was held on March 26 and 27, 2018. Vernon and Culotti testified, and portions of Briles's deposition testimony were read into the record. The primary dispute at trial concerned ownership of the vendors' in-kind contributions.

1.    *Vernon's testimony*

Vernon testified that in the fall of 2011, during Vernon's initial discussions with Culotti about the HOR concept, they discussed at length how vendors would provide both products and cash in exchange for access to the showcase home, and HOR would benefit from both types of promotional consideration.

---

[9]    Ultimately HOR did not file a tax return in 2013, and the depreciation schedule was never filed.

8

According to Vernon, Culotti represented during these discussions, prior to forming HOR, that HOR would be paid for the in-kind product contributions. Vernon admitted she and Culotti did not discuss the source of payment that would be made to HOR for the donated products (Vernon believed at the time Culotti was the sole owner of the property), when the payments would be made, or whether the payments would be made in a lump sum or from the proceeds of the sale of the La Mesa property. Vernon was asked, "[I]n terms of the timing of the payment, did that matter to you very much?" She responded, "It didn't."

After the HOR operating agreement was executed in January 2012, Vernon was largely responsible for obtaining the vendor sponsorships. Vernon testified her understanding was that under the agreements the vendor contributions would belong to HOR and be a source of revenue for the company. Vernon stated the reason the vendors were required to specify the value of their contributions in the vendor agreements is that "[w]e wanted to account for each vendor product in the value so that we could be reimbursed by the owner . . . [¶] . . . [¶] [of] the house." Vernon, who did not draw a salary from HOR, was responsible for creating an HOR magazine and Web site to showcase the rooms and products at the La Mesa property. By March or April 2012 Vernon was working on the marketing program and creating a sales kit for sponsors. She also began planning approximately 20 events at the property and coordinating sponsors.

Around September 15, 2012, just after HOR's opening event, Vernon said to Culotti, "[W]e really need to start looking at settling . . . the value for the in-kind products. We need to . . . get paid for those goods. When are we gonna do that?" Culotti

9

responded, "Those are goods that myself and Briles and our partnership will have the value for, not House of Rock. You will not receive any value for those goods." Vernon responded, "that's not right," and explained she found it "incredible" that Culotti would take this "egregious" position. Vernon claimed she first made a demand to Culotti for payment for the value of contributions in an e-mail on November 12, 2012.[10]

At trial Vernon claimed she was entitled to at least $550,000 for the in-kind contributions, based on a total valuation of the products of $1,113,646 as stated in Culotti's declaration and HOR's 2012 draft depreciation schedule.[11] On cross-

---

[10] On November 12, 2012, Culotti sent an e-mail to Vernon in which she stated, "What I don't understand is the claim to installed inventory to the house as anything more than we agreed to in the beginning." She added, "The wall paper, tile, plumbing, lighting and things acquired [b]y me thru our concept require a pay back of 3 photos, the journal and [t]he opening event. No other commitments were made to the vendors or to the development co. [N]o fees back for involvement or commissions." She concluded, "The HOR not making money this season does not mean that we have the right to go to the development company [(BCP)] to cut our losses." Vernon responded, "We aren't in agreement on HOR assets being given to the development company in exchange for rent. I have communicated this since you mentioned it. . . . We should look at the overall business and discuss." Culotti disputed that this e-mail constituted a demand for payment for the in-kind contributions, arguing Vernon's first demand was not until March 7, 2013, when Vernon's lawyer sent a formal demand letter to Culotti.

[11] Vernon testified that in early 2013 she provided the tax accountants with the vendor agreements, which contained

examination, Vernon admitted patio furniture from one vendor totaling $27,000 was returned to the vendor, and she would not seek compensation for an outdoor kitchen worth $22,903 that was never installed permanently at the La Mesa property.[12]

2.      *Culotti's testimony*

Culotti testified it was always her intent the in-kind product contributions belonged to BCP in exchange for rent-free use of the La Mesa property as a showcase, although she also admitted her showcase concept was intended to help the La Mesa property sell more quickly and at a higher price. She testified BCP "would trade rent for its location based on the contributions that would remain installed. That was the contribution of HOR to [BCP]." She added, "That was always my intent." When asked whether she ever had a discussion with Vernon during the period from when they just met until the fall of 2012 when they started to have issues about payment for the contributions, Culotti responded, "No." Culotti viewed the products installed on the property as leasehold assets, and she stated it would make no sense for Vernon and Culotti to have agreed the La Mesa property would have to be torn apart to remove the installations.

_____

estimated retail values for the in-kind contributions, for the accountants to use in generating the depreciation schedule.

[12]     Culotti also objected to inclusion of $150,000 for electronics contributed by Sony and $12,000 for Farley interlocking paving stones because Vernon could not find and produce vendor agreements or receipts documenting the value of those contributions. However, the court did not deduct the value of these items from its award, and Culotti does not assert this as an issue on appeal.

According to Culotti, she told Vernon from "day one," before entering into the HOR operating agreement, that the in-kind contributions would be leasehold assets. Culotti stated her design company, Porta Bella, procured 90 to 95 percent of the in-kind contributions. HOR's business plan was never about making money from the vendors' in-kind contributions; rather, it was about building an online marketing business that would ultimately allow consumers to purchase showcase products through the HOR Web site.

Culotti was examined about the declaration she submitted in connection with her summary adjudication motion. Culotti was asked with respect to the statement in her declaration as to the value of the vendors' in-kind contributions, "[B]ased on your own personal experience as an interior designer and a home remodeler, you are standing by that $1,113,646 valuation stated in line 11?" Culotti responded, "As a retail value, yes." Contrary to what she stated in her declaration, however, Culotti testified she did not recall taking a position in the arbitration that she was entitled to recover from BCP 50 percent of the in-kind contributions, and she denied asking the arbitrator to award her this category of damages.

3. *Briles's deposition testimony*

In the portions of his deposition testimony admitted at trial, Briles stated he and Culotti discussed her concept of a Rolling Stone showcase home at the time BCP purchased the property. Culotti told him any in-kind contributions to the La Mesa property would be "pure donations" that would remain in the home at the time of sale. Culotti never told Briles that BCP would have to pay for the contributions, although he never had

12

any further discussions on that topic after BCP was formed in 2010.  Briles initially met Vernon socially, and he may have seen her one or two times after that, but they never discussed HOR business.

F.    *Statement of Decision*

The parties filed written closing arguments following trial, and on June 22, 2018 the trial court issued a proposed statement of decision.  After considering the parties' written objections and responses, the court issued a 13-page statement of decision on October 3, 2018.

The trial court found Culotti breached her fiduciary duties of loyalty and care to HOR by permitting the in-kind contributions to be given to BCP without compensation for HOR. The court recognized there was contradictory testimony as to how the in-kind contributions would be handled: Vernon testified Culotti represented to her HOR would be paid for the value of the products, whereas Culotti testified they never discussed the issue.  However, the court found "Culotti to be a less credible witness than Vernon," and although there was no written agreement regarding payment for the contributions, "the court believes Vernon's representations that she and Culotti had such an agreement."

The court found Culotti's position HOR was not the owner of the vendors' in-kind contributions was contradicted by Culotti's declaration in support of her motion for summary adjudication, in which Culotti testified she had asserted a position in her arbitration against Briles that the value of products, or at least half that value, should be credited to Culotti in the unwinding of BCP because they constituted a contribution by her (as a 50

13

percent owner of HOR) to the partnership.[13]  The trial court took judicial notice that the arbitrator in the *Culotti v. Briles* arbitration awarded Culotti $531,860 for her 50 percent interest in the in-kind contributions she had asserted were the property of HOR.

Further, the court found Culotti's testimony that HOR's primary business model was to earn money by building online showrooms to sell home furnishings, not by receiving the value of contributed products, was not supported by any evidence or language in the HOR operating agreement.  Further, there was no evidence supporting Culotti's testimony that 90 to 95 percent of the in-kind contributions were procured by Porta Bella.  To the contrary, Porta Bella was not a party to or identified in any of HOR's vendor agreements.

The court also ruled in favor of Vernon on her claim for quantum meruit against BCP and the Culottis.[14]  The court found the vendors made in-kind contributions in consideration for promotional and marketing exposure created by HOR, and the donated products and the HOR showcase itself increased the market value of the La Mesa property and enriched BCP.

---

[13]    The trial court noted Culotti's contrary position in the arbitration and her assertion of that position to seek adjudication of Briles's cross-claim in this action might be subject to judicial estoppel, but "[e]ven if the theory of judicial estoppel, which is to be used sparingly, does not apply, Culotti has been impeached and her credibility has been diminished."

[14]    The court found Briles had no individual liability for the in-kind contributions.  The court awarded Biles on his indemnity cross-claims against the Culottis a 25 percent contribution for his portion of BCP's damages pursuant to an indemnity provision in the BCP partnership agreement.

14

Accordingly, "it would be unjust to permit the BCP to retain the benefit of the vendor product contributions without paying HOR for procuring the goods from sponsors."

The trial court awarded Vernon damages of $531,871 against Culotti, based on a total valuation of the vendor contributions of $1,063,742. That amount was based on the $1,113,646 aggregate retail value of the vendor contributions listed in the draft depreciation schedule and stated in Culotti's declaration in support of her summary adjudication motion, less the value of the outdoor furniture and kitchen that did not remain at the La Mesa property. The court awarded the same amount as damages on Vernon's quantum meruit claim, but clarified Vernon was entitled only to a single recovery.

The court denied Vernon's request for prejudgment interest, finding there was no agreement for HOR to be paid for the in-kind contributions by a date certain, and therefore the damages were not sufficiently ascertainable to support prejudgment interest. The court rejected as arbitrary Vernon's position damages were ascertainable on November 1, 2012, when all of the products had been installed at the La Mesa property.

The trial court entered judgment on November 5, 2018. Vernon timely appealed the award of prejudgment interest in the judgment. Culotti timely cross-appealed from the judgment.[15]

---

[15] Vernon states in her opening brief she settled with Briles, BCP, and Gary, and they are not parties to the appeal.

# DISCUSSION

A.  *Standard of Review*

"""In general, in reviewing a judgment based upon a statement of decision following a bench trial, 'any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.  [Citations.]'  [Citation.]  In a substantial evidence challenge to a judgment, the appellate court will 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings].  [Citations.]'  [Citation.]  We may not reweigh the evidence and are bound by the trial court's credibility determinations.  [Citations.]  Moreover, findings of fact are liberally construed to support the judgment."""  (*Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1102 (*Tribeca*); accord, *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 334 (*Sav-On Drug Stores*) ["'[Q]uestions as to the weight and sufficiency of the evidence, the construction to be put upon it, the inferences to be drawn therefrom, the credibility of witnesses . . . and the determination of [any] conflicts and inconsistencies in their testimony are matters for the trial court to resolve.'"]; see *Vasquez v. LBS Financial Credit Union* (2020) 52 Cal.App.5th 97, 109 [substantial evidence standard of review applies to express and implied findings of fact made by the superior court in its statement of decision rendered after a bench trial]; *Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 [same].)

However, "'[i]n reviewing a judgment based upon a statement of decision following a bench trial, we review questions

of law de novo.'" (*Veiseh v. Stapp* (2019) 35 Cal.App.5th 1099, 1104; accord, *Thompson v. Asimos, supra*, 6 Cal.App.5th at p. 981; see *Feresi v. The Livery, LLC* (2014) 232 Cal.App.4th 419, 425 (*Feresi*) [questions concerning the scope of the fiduciary duties imposed by law on partners is a legal issue subject to de novo review].)

Finally, "[w]e apply the abuse of discretion standard of review to any ruling by the trial court on admissibility of evidence, including requests for judicial notice." (*Center for Biological Diversity v. Department of Conservation, etc.* (2019) 36 Cal.App.5th 210, 227; accord, *In re Social Services Payment Cases* (2008) 166 Cal.App.4th 1249, 1271.)[16]

B.    *Substantial Evidence Supports the Trial Court's Finding Culotti Breached Her Fiduciary Duties to Vernon*[17]

A member of a member-managed limited liability company owes fiduciary duties of loyalty and care to the company and its

---

[16]    Culotti contends her appeal raises mixed questions of law and fact and the judgment should therefore be reviewed de novo. But the gravamen of Culotti's appeal is that the evidence does not support the trial court's finding the parties orally agreed the in-kind contributions belonged to HOR. We therefore review the judgment for substantial evidence. With respect to Culotti's contention the trial court erred in relying on inadmissible evidence to calculate damages, we review the court's evidentiary determinations for an abuse of discretion.

[17]    Because we affirm the trial court's finding that Culotti breached her fiduciary duties, we do not reach Culotti's challenge to the trial court's holding as to Vernon's causes of action for quantum meruit and unjust enrichment, for which the court ordered duplicative recovery.

17

other members.  (Corp. Code, § 17704.09, subd. (a).)  A member has a duty "[t]o account to the . . . company and hold as trustee for it any property, profit, or benefit derived by the member in the conduct . . . of the activities of [the] company or derived from a use by the member of [company] property, including the appropriation of a . . . company opportunity" (*id.*, subd. (b)(1)); "[t]o refrain from dealing with the . . . company . . . as or on behalf of a person having an interest adverse to the . . . company" (*id.*, subd. (b)(2)); and to "discharge the duties to [the] company and the other members . . . and exercise any rights consistent with the obligation of good faith and fair dealing" (*id.*, subd. (d)). (*Feresi, supra*, 232 Cal.App.4th at p. 425 [A member is "obligated to act with the utmost loyalty and in the highest good faith when dealing with any member of the LLC, . . .  [The member] may not obtain any advantage over [plaintiff] (or any other member of the LLC) by even the slightest misrepresentation or concealment."].) The trial court found Culotti breached her fiduciary duties of loyalty and care to Vernon and HOR by claiming the in-kind contributions were the property of BCP although they were owned by HOR pursuant to Culotti's agreement with Vernon.

Culotti contends the in-kind contributions never belonged to HOR.  But the trial court credited Vernon's testimony the parties had an oral agreement HOR would make money from the vendor contributions by owning the contributed goods, and it found Culotti's testimony the parties never discussed the issue yet always understood BCP would receive the contributions not credible.  We defer to the trial court's credibility findings. (*Sav-On Drug Stores, supra*, 34 Cal.4th at p. 334; *Tribeca, supra*, 239 Cal.App.4th at p. 1102.)  Further, the court's credibility determination was supported by Culotti's admission in her

18

declaration in support of summary adjudication that she had taken the position in her arbitration with Briles that the in-kind contributions were a donation from HOR to BCP for which she was entitled to reimbursement from BCP. Moreover, there was no evidence supporting Culotti's assertion HOR's anticipated source of revenue was profits from an online catalog and shopping portal. To the contrary, there was substantial evidence Vernon, who gave up a large salary in events marketing and promotions to join HOR, focused her efforts on securing sponsors and product contributions for the La Mesa property and events held there to generate income for HOR and its partners.

Culotti contends it would make no sense for BCP to agree HOR could keep the benefit of the vendors' in-kind contributions because BCP would then receive no consideration for allowing HOR to use the La Mesa property rent free as a showcase to launch HOR's brand. But Culotti testified she expected the HOR concept would generate publicity and buyer interest in the La Mesa property and accelerate a sale at a higher price than comparable homes.[18]

Substantial evidence therefore supported Vernon's position the parties agreed HOR was entitled to the value of the in-kind

---

[18] Culotti also contends if she had agreed HOR would own the in-kind contributions, this would have required BCP to rip out fixtures and return them to HOR. But there is no evidence the agreement required BCP to tear out the fixtures instead of paying for their value. Nor does the language in the vendor agreements defining the "owner" of the fixtures support Culotti's position. Although the agreements provide the "owner" would keep the in-kind contributions, and they define "owner" to mean the owner of the La Mesa property, the first sentence of the agreements defines the "owner" to mean HOR.

contributions. The fact there is evidence on which the trial court could have found in favor of Culotti does not support a contrary result because we "view[] the evidence and resolv[e] all evidentiary conflicts in favor of the prevailing party and indulg[e] all reasonable inferences to uphold the judgment." (*Vasquez v. LBS Financial Credit Union, supra*, 52 Cal.App.5th at p. 109; accord, *Tribeca, supra*, 239 Cal.App.4th at p. 1102.)

C.      *Substantial Evidence Supports the Damages Award*

Culotti contends the trial court erred in calculating Vernon's damages because it relied on the draft depreciation schedule and the arbitrator's award in the *Culotti v. Briles* action to establish the value of the in-kind contributions. Culotti also argues the court failed to offset its award by the La Mesa property's rental value. Both contentions lack merit.

In calculating damages, the trial court relied principally on Culotti's declaration in support of her summary adjudication motion filed in this action, in which she testified she had previously asserted in the arbitration that she "'made a $1,113,646 ["]in-kind["] contribution [to BCP] through fixtures provided by [HOR].'"" Culotti testified as to her declaration that, except for the mathematical calculations, the statement "was based on my own personal knowledge . . . as to the value such fixtures added to the La Mesa [p]roperty." At trial, Culotti admitted $1,113,646 was an accurate appraisal of the retail value of the in-kind contributions.[19] Culotti's admissions were

---

[19]     Culotti contends the declaration contained an important qualification in stating the damages estimate was based on Culotti's personal knowledge "[e]xcept for the mathematical

sufficient to establish the retail value of the in-kind contributions.

Further, the trial court did not abuse its discretion by admitting the draft depreciation schedule, for which a sufficient foundation was provided. Although the schedule was stamped "draft" and was never filed with the tax authorities, Vernon testified the schedule listed the retail value of each in-kind contribution based on the figures provided in the respective vendor agreements. Moreover, Culotti did not present any evidence showing the schedule was inaccurate or failed to reflect the amounts in the vendor agreements, and the trial court reduced the total amount of vendor contributions by the value of the items Culotti showed BCP did not retain.

Culotti also contends the trial court abused its discretion in taking judicial notice of the fact the arbitrator in the *Culotti v. Briles* action awarded Culotti 50 percent of the $1,113,646 total vendor contributions. But any abuse of discretion was harmless because this evidence was cumulative of the ample evidence supporting the trial court's damages calculation, and there is no indication the court relied on this fact in calculating the award.[20]

---

calculations within it." But Culotti fails to point to any error in the mathematical calculations.

[20] Culotti's contention the court improperly applied issue or claim preclusion likewise lacks merit. Culotti was not precluded from litigating damages in this action based on her inconsistent position in the arbitration. Instead, the court calculated damages based on Culotti's declaration and trial testimony, and the court properly considered Culotti's inconsistent arbitration position to impeach her credibility.

21

Finally, Culotti contends the trial court erred by refusing to offset Vernon's damages with the value received by HOR for the rent-free use of the La Mesa property as a showcase. But as discussed, there was substantial evidence Culotti and Briles intended and understood that BCP would benefit significantly from the HOR showcase through a more lucrative sale of the La Mesa property.

D.     *The Trial Court Erred in Denying Prejudgment Interest*

Under Civil Code section 3287, subdivision (a),[21] a plaintiff is entitled to an award of prejudgment interest where damages are "certain, or capable of being made certain by calculation, and the right to recover [the damages] is vested in the [plaintiff] upon a particular day . . . ." The Supreme Court has interpreted this language to establish three conditions for the recovery of prejudgment interest: "(1) There must be an underlying monetary obligation; (2) the recovery must be certain or capable of being made certain by calculation; and (3) the right to recovery must vest on a particular day." (*Tripp v. Swoap* (1976) 17 Cal.3d 671, 682 (*Tripp*) [applying three factors in mandamus action], disapproved on another ground in *Frink v. Prod* (1982) 31 Cal.3d 166, 180.) ""The statute . . . does not authorize prejudgment interest where the amount of damage, as opposed to the determination of liability, 'depends upon a judicial determination based upon conflicting evidence and it is not ascertainable from truthful data supplied by the claimant to his debtor.' [Citations.]" [Citation.] Thus, where the amount of damages cannot be resolved except by verdict or judgment, prejudgment

---

[21]     All further statutory references are to the Civil Code.

interest is not appropriate." (*Children's Hospital & Medical Center v. Bontá* (2002) 97 Cal.App.4th 740, 774; see *Olson v. Cory* (1983) 35 Cal.3d 390, 402 ["Generally, the certainty required of Civil Code section 3287, subdivision (a), is absent when the amounts due turn on disputed facts, but not when the dispute is confined to the rules governing liability."].)

"[O]ne purpose of section 3287, and of prejudgment interest in general, is to provide just compensation to the injured party for loss of use of the award during the prejudgment period—in other words, to make the plaintiff whole as of the date of the injury." (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 663; accord, *Howard v. American National Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 535; see *Watson Bowman Acme Corp. v. RGW Construction, Inc.* (2016) 2 Cal.App.5th 279, 293 ["prejudgment interest compensates for the loss of the use of the money during the period between the assertion of the claim and the rendition of judgment"].) "Courts generally apply a liberal construction in determining whether a claim is certain, or liquidated." (*Howard*, at p. 535; accord, *State of California v. Continental Ins. Co.* (2017) 15 Cal.App.5th 1017, 1038.)

Similarly, an award of prejudgment interest under section 3287, subdivision (a), is not authorized when there is a factual dispute whether "plaintiff was entitled to interest from any particular date prior to the verdict." (*Happoldt v. Guardian Life Ins. Co. of America* (1949) 90 Cal.App.2d 386, 405 [trial court erred in awarding prejudgment interest accruing from the date plaintiff served a claim on defendant carrier under an accidental death insurance policy because there was no evidence showing when the insured notified the carrier the insured's death was accidental, which was a condition for payment on the claim]; see

*Cox v. McLaughlin* (1881) 76 Cal. 60, 70 [affirming denial of prejudgment interest where plaintiff's "services and the material furnished by him were uncertain as to amount, character, value, and time of payment, until fixed by a verdict or findings of the court"].)

"""On appeal, we independently determine whether damages were ascertainable for purposes of the statute, absent a factual dispute as to what information was known or available to the defendant at the time" [citation].'" (*State of California v. Continental Ins. Co., supra*, 15 Cal.App.5th at p. 1038; accord, *Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 151.)

Vernon contends she was entitled to prejudgment interest as of November 12, 2012, the date on which Vernon sent an e-mail to Culotti objecting to Culotti's assertion BCP owned the in-kind contributions, or as of March 7, 2013, the date on which Vernon's lawyer sent a demand letter to Culotti for payment. Vernon argues damages—the dollar value of the total in-kind contributions listed in the vendor agreements—were ascertainable by either date and Culotti's obligation to pay had accrued as a result of her breach of fiduciary duties on September 15, 2012, when Culotti first claimed the in-kind contributions belonged to BCP. Culotti asserts both the amount of the damages and the date by which payment was due were uncertain, and therefore the trial court properly denied prejudgment interest.[22] We agree with Vernon that by the time

---

[22] Culotti also contends Vernon waived her right to seek prejudgment interest because she did not include it in her prayer for relief in the operative second amended complaint and did not argue for prejudgment interest in her initial written closing

of Vernon's March 7, 2013 demand letter, the amount of the damages and date by which payment was owed were certain.

As discussed, the vendor agreements listed the retail value of the in-kind contributions, which Culotti could have used as early as September 2012 (when Culotti first claimed BCP owned the in-kind contributions) to calculate the total value of the in-kind contributions. However, as of that date Vernon had not specifically demanded payment from Culotti for the contributions; instead, she stated more generally, "[W]e really need to start looking at settling . . . the value for the in-kind products. We need to . . . get paid for those goods. When are we gonna do that?" As of September 2012, it was thus uncertain by when BCP needed to pay for the contributions and whether BCP

---

argument. As to the first contention, the second amended complaint included a prayer for "interest at the maximum legal rate" and sought "such other and further relief as the Court may deem just and proper." "A general prayer in the complaint is adequate to support an award of prejudgment interest. 'No specific request for interest need be included in the complaint; a prayer seeking "such other and further relief as may be proper" is sufficient for the court to invoke its power to award prejudgment interest.'" (*North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 829.) Here, Vernon specifically requested interest in her prayer for relief. As to Culotti's second contention, she is correct Vernon did not address prejudgment interest in her initial closing brief, but she did in her May 11, 2018 response to Culotti's closing argument, and Culotti responded to this argument in her sur-reply brief filed on May 18, 2018. Both briefs were filed before the trial court issued its proposed statement of decision on June 22, 2018. Because the parties were afforded an opportunity to address this issue in the trial court, we decline to find waiver.

could return the fixtures and furnishings HOR claimed it owned in lieu of payment.  Indeed, some of the furnishings were at some point returned to the vendors, as shown by the trial court's deduction from the damages award for the patio furniture valued at $27,000 returned to one vendor and the reduction of $22,903 for an outdoor kitchen that was not "permanently" installed at the La Mesa property.  In addition, the record does not reflect by when all of the in-kind contributions listed in the vendor agreements were installed at the La Mesa property.  In posttrial briefing, Vernon asserted all the in-kind contributions were installed at the La Mesa property by November 1, 2012, when the La Mesa renovation was complete and "the HOR events were taking place."  But there was no evidence to support this assertion.

Vernon argues the damages were at least ascertainable by November 12, 2012, when she made her first demand for payment in her e-mail to Culotti, in which she stated she and Culotti "aren't in agreement on HOR assets being given to the development company [BCP] in exchange for rent."  But this e-mail was no more a demand for payment for the in-kind contributions than the September 2012 discussion, in which Vernon and Culotti disagreed as to whether HOR or BCP owned the in-kind contributions.

However, the March 7, 2013 letter from Vernon's attorney to Culotti made clear the value of the claimed contributions ($1,093,242) and a demand Culotti agree to payment for the value of the in-kind contributions by liquidating HOR and "divid[ing] the remaining funds [after paying liabilities] evenly between you and . . . Vernon pursuant to the [operating] Agreement," or face a lawsuit for breach of her fiduciary duties

26

and fraud. Further, by this date, the last showing of the La Mesa property had occurred,[23] so it is a reasonable assumption the in-kind contributions had been placed in the La Mesa property, and there was no evidence any contributions were returned to HOR. Thus, as of the date of the demand, Vernon's damages were "certain, or capable of being made certain by calculation." (§ 3287, subd. (a); accord, *Tripp, supra*, 17 Cal.3d at p. 682.)

Likewise, the "right to recover [was] vested" in Vernon when Culotti refused to pay for the in-kind contributions upon a demand from Vernon. (§ 3287, subd. (a); *Tripp*, at p. 682.) Although, as the trial court found, there was no initial agreement by Vernon and Culotti as to the date Culotti (and BCP) would pay for the in-kind contributions, the court found Culotti had breached her fiduciary duties at the time of her September 15, 2012 conversation with Vernon in which she claimed a right to the in-kind contributions. Had the initial agreement between Vernon and Culotti set a precise future date for payment for the in-kind contributions, then arguably the right to recover might have vested at a future date. But in the absence of any agreement as to a future date of payment, once Culotti breached her fiduciary duties on September 15, 2012, upon a demand for payment, the right to payment was vested in Vernon. Finally, an award of prejudgment interest from March 7, 2013, after which the La Mesa property was no longer being used for HOR events, would serve the purpose of section 3287, subdivision (a), "to provide just compensation to the injured party for loss of use of the award during the prejudgment period." (*Lakin v. Watkins*

---

[23] Vernon testified HOR hosted events at the La Mesa property from September 15 to December 6, 2012.

*Associated Industries, supra*, 6 Cal.4th at p. 663; accord, *Howard v. American National Fire Ins. Co., supra*, 187 Cal.App.4th at p. 535.)

## DISPOSITION

The judgment is reversed as to the denial of prejudgment interest.  The matter is remanded for further proceedings as to the determination of prejudgment interest.  In all other respects, the judgment is affirmed.  Vernon is to recover her costs on appeal.


FEUER, J.

We concur:



PERLUSS, P. J.



RICHARDSON, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.