Filed 11/24/25 Estate of McMahon CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| Estate of DAVID J. McMAHON, Deceased._____ BOGDAN VINER,     Plaintiff and Respondent, v. KIM SCHWARCZ, as Personal Representative, etc.,     Objector and Appellant. | A170254 (San Francisco City & County Super. Ct. No. CGC-19-575298) |

In this proceeding for unpaid wages, Kim Schwarcz, as personal representative of the estate of David J. McMahon, appeals from a judgment after a jury trial, awarding Bogdan Viner[1] approximately $113,950 in unpaid wages and waiting time penalties. Schwarcz contends Bogdan's complaint was untimely, and even if it was not, the verdict is not supported by substantial evidence and, specifically, there is no evidence supporting the jury's findings as to Bogdan's hourly rate of pay (for purposes of unpaid

---

[1] Since Bogdan Viner's sister, Esfir Viner, is also involved in these proceedings, we will refer to the Viner siblings by their first names to avoid confusion.

1

wages) and daily rate of pay (for purposes of waiting time penalties).  We affirm.

## BACKGROUND

David McMahon was an attorney who specialized in performing legal audits—i.e., he reviewed attorneys' fees for insurance companies and other individuals and entities to make sure they were reasonable and necessary, and that the client was not overpaying.  McMahon also testified at trials as an expert witness with respect to the reasonableness of such fees.  To perform this work, McMahon was required to generate detailed audits of the billing records at issue.

In January 2016, McMahon left his partnership with a law firm and went into business for himself, focusing on his legal audit work.  He enlisted the services of Victoria Boyko, his former legal assistant; Bogdan Viner, Boyko's life partner who had a background in IT; and Esfir, Bogdan's sister who had an accounting background.  After working together successfully for slightly over a year, McMahon's relationships with Boyko, Bogdan, and Esfir soured, and they ceased working for him.

In April 2019, Bogdan filed a complaint against McMahon, alleging, as relevant here, causes of action for unpaid wages (Lab. Code, §§ 201, 204); waiting time penalties (*id.*, § 203); unfair business practices under the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.; UCL); and quantum meruit.  Bogdan also sought attorney fees (Lab. Code, § 218.5) and interest (*id.*, § 218.6).  Boyko and Esfir filed similar complaints in September 2018 and November 2018, respectively.

In 2020, McMahon unexpectedly passed away.  The probate court appointed Kim Schwarcz, a professional fiduciary, as personal representative

of the estate.  Thereafter, Schwarcz was substituted into all three cases as the defendant.  The three matters were ultimately consolidated for trial.[2]

### Summary of Trial and Related Proceedings

Jury trial took place over the course of seven days in July 2023.  The evidence adduced included the following:

#### Testimony of Victoria Boyko

Boyko was born in Ukraine and, while a child, emigrated to San Francisco with her family.  She graduated from college with a degree in finance and subsequently worked various office jobs, including as a finance manager and an accounting manager.

She met McMahon in 2013, when he offered her a job as an assistant at the law firm where he was a partner.  Boyko was eventually hired as an independent contractor to help McMahon with his legal audits.  Thereafter, the law firm merged with another firm.  Boyko continued to work for McMahon.  Among other tasks, she created marketing brochures at McMahon's request which introduced McMahon and Boyko as the firm's audit team.

During this timeframe, McMahon also recruited Bogdan, Boyko's long-term partner, to assist with his legal audit work.

Throughout 2015, McMahon spoke with Boyko about wanting to start his own company so he would have more control over his legal auditing business and less overhead.  According to Boyko, McMahon wanted to create two entities—a law firm for his litigation work and a company for his legal audit work.  As to the legal audit business, "he was looking for a partner to do

---

[2] On our own motion we take judicial notice of the appellate record in each of the two matters tried with Bogdan's case—No. A170193 (Esfir) and No. A170449 (Boyko)—for purposes of this appeal.  (Evid. Code, §§ 452, subds. (c) & (d), 459, subd. (a).)

the audits with and to support him in his audits." According to Boyko, the idea was that she and McMahon would be 50/50 partners in the audit business (which was approximately 90 percent of McMahon's total work). As to the general litigation legal work (i.e., the remaining 10 percent of McMahon's work), Boyko would act as office manager, and when she assisted him as a paralegal, she would be paid by the hour. McMahon spoke of retiring in 10 years, at which time she would take over the audit business, with McMahon continuing to do marketing for the company. While McMahon filed papers with the Secretary of State and opened a bank account for the audit business (Fulcrum Litigation Management), he never prepared a written partnership agreement or fully utilized Fulcrum.

Around Christmastime, McMahon treated Boyko, Bogdan, and Esfir to a celebratory dinner at which McMahon stated he was ready to open a new company, with Bogdan doing IT and Esfir doing bookkeeping and accounting.

Early on, they had a meeting where McMahon explained they would not be paid immediately because clients often took 90 days or even more to pay for services. McMahon told Esfir she would be paid at market rate for her accounting services. An e-mail from McMahon was admitted into evidence confirming that Bogdan's rate of pay for IT services was $140 per hour. A document was admitted into evidence showing McMahon's billing rate of $450 per hour. No similar evidence was presented as to Bogdan's, Esfir's or Boyko's rate of pay per hour for legal auditing services.

Boyko would sit in on meetings with audit clients and would be introduced to them either as McMahon Law's audit director or partner. Boyko did not know at the time that she could not be a partner in a law firm because she was not a lawyer. With respect to the audit work, all her

4

discussions with McMahon were partnership based, and the work was supposed to be conducted by a different entity than his litigation work.

The audits could be very complex. Boyko recalled one involving 25 million dollars of legal fees over the course of 10 years and included 18 different law firms, as well as related vendors and expenses.

After McMahon was hired to conduct an audit, Bogdan would take the digital files and "data map[]" them so that they could be merged into McMahon's proprietary audit software, which could read them and create reports. While this was being done, Boyko and McMahon went through a paper version of the files and assigned every entry on every invoice a specific code by hand. Boyko would then, under McMahon's supervision, enter the codes for each item into the audit software.

Although Boyko was hired to supervise staff and be McMahon's point person, she could not make a move without McMahon's instructions or authority. She never went to the bank without McMahon's authorization, and he usually accompanied her. McMahon would review all invoices before Boyko was allowed to authorize Esfir to pay them. She had to get permission from McMahon to contact clients.

The group used several offices. One was in the home shared by Boyko, Bogdan, their children, and Esfir, where McMahon had his own space and computer. Another was in the basement of a house McMahon owned in Mill Valley which was otherwise rented to tenants. A third was located in the home where McMahon lived with his wife. The fourth was a traditional office space with a conference room McMahon rented in San Francisco.

Boyko worked approximately 60 to 70 hours in a typical week and would work evenings and weekends as needed. She kept timesheets reflecting the billable hours she worked on audit cases.

She was paid infrequently because McMahon would only pay her after a client paid. Even then, he only paid Boyko for a portion of her work.

Boyko prepared a printout of all wages McMahon paid her, which was admitted into evidence. From April to July 2016, she received payments totaling approximately $200,000. She received payments in the same range in 2017. However, according to Boyko, the approximately $140,000 she was paid in February 2017 was due to the fact she had asked McMahon in January to start paying her what she was already owed and to prepare the partnership documents. McMahon said he would get back to her with respect to the partnership documents. But after that, her assignments and communications between the two started to decline.

After she received the February payment, McMahon asked to meet about the partnership. At a meeting on February 15, the two discussed the goals of the audit business and their positive working relationship. McMahon apologized for his previous actions and stated he wanted to continue the business. They made plans to meet two days later at the San Francisco office to go over an expert report that was being prepared for a client. McMahon said he would bring a written partnership agreement at that time.

On the morning of the scheduled meeting, McMahon called Boyko, crying and asking her not to leave him. At the time, she took this to mean that he did not want her to leave the business, as he had recently told her his wife had left him. When Boyko got to the meeting, however, McMahon proposed they not only work together but "be together" romantically. Boyko was shocked. She told him he needed to get himself together and that was not what their relationship was about. Then she left.

6

Boyko worked on her own on a client audit through February but then did no more work for McMahon.

Boyko created records of the time she worked in December 2016, January 2017, and February 2017. Her time was billed out to clients at $250 an hour, which was sometimes discounted to $210 if the client was given a discount. McMahon told her that her client billing rate would also be her pay rate.

According to Boyko, she was owed $140,000. Although she believed she was entitled to share in the profits of the company, she did not think she could ask McMahon for a 50/50 share because there was no written partnership agreement.

The following month, in March, McMahon texted Boyko, apologizing and saying he hoped they could be friends and get back to their business relationship. Although she did not see him in person, she heard from him by text throughout the month, and by e-mail even after that.

Boyko did not have a clear understanding of when her employment ended, but hypothesized it was in September. She was on vacation from March through May. By May, she had heard McMahon was refusing to pay people, but she continued to receive e-mails from him about twice a month on work matters. She still had access to McMahon Law e-mail and documents.

### Testimony of Bogdan Viner

Bogdan was born in Latvia and came to the United States when he was 16, where he received an associate's degree in computer science. He met McMahon through Boyko, and the two subsequently became friends. At some point, McMahon told him he was looking for help on some projects, with the idea of eventually starting his own company.

Bogdan then did some legal auditing work for McMahon, before McMahon left his law firm to go out on his own. Bogdan did the work at his home or at the firm's offices in the evenings. He was paid for this work through A2Z, an LLC Bogdan created two years before meeting McMahon. Bogdan intended to use the entity for real estate sales but never did. McMahon and Bogdan used A2Z so McMahon could present Bogdan "as his legal auditor who, as a company, would do legal audits on his behalf."

McMahon prepared an invoice from A2Z for this initial project in the amount of $81,750, which was admitted into evidence and reflected both Bogdan's hours and the hours of others. McMahon also prepared a second invoice for this project, but Bogdan could not remember the amount of that invoice. The understanding between the two men was, when the client paid, they would split the payment 30 percent to Bogdan and 70 percent to McMahon. A check for $123,100 payable to A2Z was admitted into evidence representing the total the client paid for the project. A cashier's check for $102,026.80 from A2Z to McMahon was entered into evidence, and Bogdan testified it represented McMahon's 70 percent share.

After they concluded this trial project to see if they worked well together, McMahon decided to go out on his own. They had a celebratory dinner at the end of 2015 at which McMahon, Boyko, Bogdan, and Esfir were present. At the dinner, McMahon indicated he wanted Bogdan to be his IT specialist and continue to do legal audits. Boyko was to be his partner in Fulcrum Litigation Management. Esfir was asked to do accounting and possibly some legal auditing, but she could only work part time because she already had a full-time job.

McMahon told Bogdan he would be paid 100 percent of whatever negotiated hourly rate was charged for his time on a legal audit project.

8

Their agreement was not in writing, but Bogdan did receive an e-mail from McMahon stating he would be paid $140 per hour for his IT work. There was also nothing in writing for the first audit representing an agreement as to Bogdan's hourly rate of pay. Every legal audit was customized, and McMahon would sit next to Bogdan, training and supervising him in using the methodology McMahon had created for each specific audit. Bogdan did the work at his home office for subsequent projects and continued to be paid through A2Z. Bogdan kept his time in six-minute increments on his computer, printing it off monthly to give it to McMahon. McMahon would prepare invoices for clients after gathering everyone's timesheets. He would make calculations and then give them to Esfir to add to the invoice. A2Z was paid $263,749.74 by McMahon Law in 2016.

Bogdan worked on a legal audit in November and December 2016 for which he was never paid. Bogdan was also not paid for a legal audit he worked on from November 2016 through January 2017. McMahon had agreed to pay him $175 per hour for both projects.

Bogdan's home computer where he kept his timesheets was subsequently destroyed by a power surge.

### Testimony of Esfir Viner

Esfir came to the United States from Latvia at a young age. She eventually earned a college degree in accounting and worked as a full-time accountant.

Esfir confirmed that an electrical surge had impacted their home computer and many different electrical appliances in the house in May 2018. She made a claim to PG&E for the damage. All her individual timesheets stored on the home computer were lost.

Esfir first helped McMahon on a legal audit when he was with his prior firm in October 2015. That same month, he told Esfir he would like her to do accounting and bookkeeping work for him if he opened his own firm. At the time, she already had a full-time accounting job, so she told him she would have to be part time. He told her he would research the market rate for her position, so he could pay her that.

At a celebratory dinner in December 2015, McMahon told Esfir she was qualified to work on legal audits, and he wanted her as part of his team. He explained to the group that he thought they worked well together, and he was going to open his own firm. McMahon reiterated to Esfir that he wanted her to do part-time bookkeeping for him and that he was going to research what a reasonable part-time rate would be. He additionally told her she might also work on legal audits, and the amount she would be paid for that would be the amount he billed to his clients for her work.

Esfir started doing bookkeeping and accounting work for McMahon in January 2016. She followed McMahon's instructions when completing all her accounting work. She never wrote a check or did a distribution without McMahon's express authorization.

Esfir kept track of the approximate number of hours she worked during the first three months of 2016, which were about 35 hours per month. She told McMahon this number so he could investigate comparable pay rates. Esfir did not otherwise keep track of her monthly accounting hours, but they remained the same. In May 2016, McMahon agreed to pay her $3,000 per month for her accounting work. She was paid for the months of June 2016 through January 2017.

At McMahon's request, Esfir prepared an invoice for what she was owed for accounting for January through May 2016. The invoice, which was

entered into evidence, reflected she was owed $15,000. McMahon told Esfir payment of the invoice would be deferred until the end of the year for cash flow purposes. She was never paid. Esfir received an e-mail in January 2017 from McMahon stating he was going to transition her away from the accounting work in favor of his tax accountants.

McMahon used a cash-based accounting software for the business. Esfir never entered data into the accounting software unless she was instructed to do so by McMahon. The software did not include what was owed or paid to employees, independent contractors, or vendors.

Esfir was involved in the creation of client invoices for McMahon from January 2016 through January 2017. She, Bogdan, and Boyko would provide their timesheets to McMahon. He would approve them and then use them, along with his e-mails and phone calls, to create his own time records. McMahon would then provide the data to Esfir, and she would input the date, description, and hours to an invoice template. Esfir would then print out a draft, which McMahon would revise. Once McMahon approved a final version, Boyko would convert it to a pdf and send it to the client. After an invoice was sent to the client, Esfir would input all the data into the accounting software. She also checked that the hours on the invoice for everyone matched the timesheets she had received. It typically took approximately 90 days for clients to pay their invoices. An income statement for McMahon Law for 2016 was admitted and showed net income of approximately $1,500,000 for the firm.

Esfir began working on legal audits for McMahon in November 2016. She calculated what she was owed for these services (as opposed to bookkeeping) to two clients by adding up all her hours listed on relevant McMahon client invoices. The invoice for January 2017 (prepared in

11

February 2017) was a draft because she never received the final. Whenever she inputted the data from the final invoice sent to a client, she also compared the hours listed for everyone on their approved timesheets, and there was never any deviation. The invoices reflected her pay rate of $175 and the total number of hours she worked. She could not say how many hours she worked on any particular day because McMahon would reallocate hours. She was never paid for this legal auditing work.

### Verdicts

As to Boyko, the jury found no partnership had been formed with McMahon. It also found facts establishing that Boyko was an employee of McMahon Law, rather than an independent contractor; that she performed work for McMahon; and that McMahon owed her wages. However, the jury also found Boyko failed to prove the *amount* of wages she was owed and also failed to prove the *value* of the services she provided for purposes of quantum meruit. It specifically found Boyko failed to prove an implied-in-fact contract to pay her wages in the amount billed to clients. The jury therefore awarded her no damages.

In contrast, the jury awarded Esfir $95,515 in unpaid wages for auditing work and determined her daily rate of pay at the end of her employment was $634.51. It also awarded Esfir $15,000 in unpaid wages for her accounting work. The jury similarly awarded Bogdan $94,832.50 in unpaid wages and determined his daily rate of pay at the end of his employment was $637.90.

### UCL Claims

After the jury returned its verdicts, the trial court considered the parties' briefing and arguments on their UCL claims. The court pronounced its decision on the record in mid-November, and subsequently filed a

12

statement of decision, wherein it noted a judge cannot ordinarily " 'ignore the jury's verdict and grant equitable relief inconsistent with the jury's findings' " and that a UCL claimant may only obtain injunctive relief or restitution. It additionally observed a court has wide discretion whether to grant relief even when an unfair business practice has been shown.

The court found McMahon had engaged in an unfair business practice by mischaracterizing Boyko, Bogdan, and Esfir as independent contractors. But, as to Boyko, it also found "Boyko was not a credible witness as to her claim of partnership with McMahon and as to her rate of pay. The court is not persuaded by Boyko's testimony that McMahon agreed to pay her 100% of the rate McMahon billed his clients for her work (i.e., a 100% 'pass-through' rate). The court finds Boyko's testimony in this regard to be in conflict with her other testimony where she claimed to be a 50/50 general partner which would have imposed upon her half of the overhead and other liabilities of the business. The court also finds Boyko's testimony of a pass-through rate inconsistent with other testimony and evidence about the methods used by McMahon to run his business." Thus, with respect to restitution under the UCL, the court found Boyko failed to prove she was harmed, the amount of any harm, or that McMahon was unjustly enriched, and that the amount already paid by McMahon to Boyko (over $400,000) was more than equitable.

In contrast, the court found Esfir and Bogdan were entitled to restitution but wholly offset the amounts " 'dollar for dollar' " by the amounts awarded by the jury as owed wages.

### Post-Trial Motions and Judgment

Judgment was issued in Bogdan's matter on December 28, 2023, awarding him $94,832.50 in unpaid wages plus $65,269.88 in pre-judgment

13

interest from February 10, 2017.  He was additionally awarded $19,137.00 in waiting time penalties and attorney fees and costs according to proof.

In January 2024, Schwarcz moved for a new trial and/or judgment notwithstanding the verdict.  Schwarcz asserted that Bogdan's claims were barred by the two-year statute of limitations for oral contracts.  In addition, she claimed the only evidence McMahon had agreed to pay Bogdan a " 'pass-through' " rate for his legal audit work was the testimony of Bogdan, his life partner, and his sister, which was insufficient and contrary to reason.  Moreover, because the court's UCL decision was based on the jury verdicts, a new trial on that claim was also required.  After briefing and argument, the court denied both motions.

## DISCUSSION

### *Statute of Limitations*

As recited above, Bogdan filed his complaint on April 16, 2019.  At trial, the jury was instructed with regards to the statute of limitations as follows: "Kim Schwarcz contends that Bogdan Viner's cause of action for Nonpayment of Wages was not filed within the time set by law.  To succeed on this defense, Kim Schwarcz must prove that Bogdan Viner's claimed harm occurred before April 15, 2017."  The jury found in favor of Bogdan—that is, it presumably found his "claimed harm for nonpayment of wages" did *not* occur before April 15, 2017.

Schwarcz takes issue with the jury's verdict on this point on two grounds.  First, she maintains the two-year statute of limitations for breach of an oral contract applies.  (Code Civ. Proc., § 339 ["[a]n action upon a contract, obligation or liability not founded upon an instrument of writing" must be commenced "[w]ithin two years"].)  Secondly, she claims since Bogdan last did legal auditing work for McMahon in January 2017 and last

14

did *any* work for McMahon in February 2017, and that the court set the date for prejudgment interest as February 10, 2017, Bogdan's cause of action *must have* accrued before April 15, 2017. The jury's finding to the contrary thus was not supported by the evidence.

In our tentative opinion, we rejected Schwarcz's statute of limitations challenge on the ground her initial premise—that the two-year limitations period for actions on an oral contract applies—was incorrect. Rather, citing *Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1395 (*Pineda*), we found applicable the three-year limitations period set forth in Code of Civil Procedure section 338, subdivision (a), for actions on a liability "created by statute, other than a penalty or forfeiture." Under the three-year statute, Bogdan's complaint was unquestionably timely.

At oral argument, counsel continued to urge that this was not an action for failure to pay statutorily mandated minimum wages, but an action for breach of an oral agreement, citing *Aubry v. Goldhor* (1988) 201 Cal.App.3d 399 (*Aubry*) which, in turn, cites to *Gardner v. Basich Bros. Construction Co.* (1955) 44 Cal.2d 191 (*Gardner*).

In *Gardner, supra,* 44 Cal.2d 191, the parties entered into an oral agreement pursuant to which the plaintiffs, licensed highway carriers, hauled material by dump truck for the defendants, highway construction contractors. (*Id.* at pp. 192–193.) The plaintiffs sued the defendants to recover the difference between the amount they paid the plaintiffs at the hourly rate and the larger amount allegedly due at the ton-mileage rate. (*Id.* at p. 193.) On appeal from judgment in favor of the plaintiffs, the defendants contended the applicable statute of limitations was the two-year period governing an action on an oral contract (Code Civ. Proc., § 339, subd. 1) rather than the three-year period for an action upon a liability created by

15

statute (*id.*, § 338, subd. (a)).  (*Gardner,* at pp. 192–194; see *Aubry, supra,* 201 Cal.App.3d at pp. 405–406.)  The Court of Appeal held the three-year statute applied.  (*Gardner*, at pp. 195–196.)

Our Supreme Court reversed, stating "[a] liability created by statute is one in which no element of agreement enters.  It is an obligation which the law creates in the absence of an agreement." (*Gardner, supra,* 44 Cal.2d at p. 194.)  "While the minimum hauling rates to be charged on either an hourly or ton-mileage basis are fixed by law, and any charge less than the established rate is 'unlawful' [citations], the law does not create the liability.  Rather the law only determines the amount of the liability created by the agreement of the parties.  The prescribed rate provisions and regulations are deemed a part of every such contract, and the parties are deemed to have contracted with such provisions in mind, for otherwise the state's rate-making policy . . . would not be effectual." (*Ibid.*)  In other words, the substantive right of action—to recover the amount assertedly agreed to and owed for hauling the freight—"stem[ed] from the performance of services pursuant to the contractual agreement of the parties.  Accordingly, the limitations period [was] determined by the nature of the contract of the parties, and depend[ed] upon whether the agreement [was] in writing or rest[ed] in parol." (*Ibid.*)

In *Aubry,* in contrast, the Labor Commissioner sued an employee's former employer to recover overtime wages and a penalty for failure to pay the wages on termination of the employment.  (*Aubry, supra,* 201 Cal.App.3d at pp. 402–403.)  The complaint variously alleged that the employee was subject to state "minimum wage laws" and wage orders regulating wages and hours in the mercantile industry, that he had been hired through an oral agreement, that the employer willfully failed to pay the overtime

16

compensation owed on the termination of his employment, and that the employer therefore was liable for " 'waiting time' " penalties under the Labor Code. (*Id.* at p. 403.) The appellate court held the three-year statute applied, stating: "At common law there is a presumption that an employee volunteers extra services performed within the scope of his employment or that his salary is intended to compensate him also for the extra work. [Citation.] Accordingly, where an employee rendering extra services receives a regular salary and such services are similar to his regular duties, the employer has no obligation to pay him for the additional services absent an express contract to that effect. [Citations.] Under the Labor Code, on the contrary, absent an explicit wage agreement a fixed salary does not serve to compensate an employee for the number of hours worked in excess of the wage order standard. [Citations.] Thus, an employer's obligation to pay overtime compensation to his employee would not exist but for the Labor Code. An action to enforce that obligation therefore is governed by the three-year statute of limitations." (*Aubry, supra,* 201 Cal.App.3d at p. 404.) The employer's reliance on *Gardner* was therefore misplaced. (*Id.* at pp. 405–406.)

Such is also the case here. Bogdan's claim was for failure to *timely* pay what he was owed and for "waiting time" penalties for failure to do so—obligations that arose from statute regardless of whether his employment agreement was oral or written. As the court in *Davis v. Farmers Ins. Exchange* (2016) 245 Cal.App.4th 1302, 1331 observed: "The wages an employer owes its employees are accorded 'a special status' under California law. [Citation.] Full and prompt payment of wages due an employee 'is a fundamental public policy of this state.' [Citation.] 'This public policy has been expressed in the numerous statutes regulating the payment,

17

assignment, exemption and priority of wages.' [Citation.] The chapter of the Labor Code governing compensation and payment of wages includes provisions requiring immediate payment of wages upon discharge, layoff or resignation (Lab. Code, §§ 201, 202), requiring regular payment of wages (Lab. Code, § 204), and prohibiting an employer from insisting an employee execute a release of a claim before paying wages due (Lab. Code, § 206.5). The Labor Code's protections are 'designed to ensure that employees receive their full wages at specified intervals while employed, as well as when they are fired or quit' [citation], and are applicable not only to hourly employees, but to highly compensated executives and salespeople." Thus, "[a]ctions for final wages not paid as required by [Labor Code] sections 201 and 202 are governed by Code of Civil Procedure section 338, subdivision (a), which provides that a three-year statute of limitations applies to '[a]n action upon a liability created by statute, other than a penalty or forfeiture.' " (*Pineda, supra,* 50 Cal.4th at p. 1395.)

Assuming, as Schwarcz urges, that Bogdan ceased working for McMahon by February 28, 2017, he therefore had three years, until February 28, 2020, to file his complaint for final wages and waiting time penalties under the Labor Code. Thus, his complaint filed on April 16, 2019, was timely.

### Substantial Evidence

Schwarcz also renews her argument that the jury finding with respect to Bogdan's hourly rate of pay for audit services ($175) is not supported by substantial evidence. She additionally contends the daily rate of pay figure

18

used by the jury to calculate waiting time penalties ($637.90) is not supported by substantial evidence.

The scope of our review of sufficiency of the evidence claims is well established. " ' "In a substantial evidence challenge to a judgment, the appellate court will 'consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]' [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment." ' " (*Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1102.)

In addition, given the briefing in this case, we find it necessary to stress "[p]erhaps the most fundamental rule of appellate law"—i.e., "that the judgment challenged on appeal is presumed correct, and it is the appellant's burden to affirmatively demonstrate error." (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.) " 'This means that an appellant must do more than assert error and leave it to the appellate court to search the record and the law books to test his [or her] claim.' " (*L.O. v. Kilrain* (2023) 96 Cal.App.5th 616, 619.) Rather, " '[i]n order to demonstrate error, an appellant must supply the reviewing court with some cogent argument supported by legal analysis and citation to the record. Rather than scour the record unguided, we may decide that the appellant has forfeited a point urged on appeal when it is not supported by accurate citations to the record. [Citations.] Similarly, we may disregard conclusory arguments that are not

19

supported by pertinent legal authority.' " (*Champir, LLC v. Fairbanks Ranch Assn.* (2021) 66 Cal.App.5th 583, 597.)

Finally, as is particularly pertinent here, " ' "[w]hen an appellant urges the insufficiency of the evidence to support the findings it is [their] duty to set forth a fair and adequate statement of the evidence which is claimed to be insufficient. [They] cannot shift this burden onto respondent, nor is a reviewing court required to undertake an independent examination of the record when appellant has shirked [their] responsibility in this respect." ' " (*In re Marriage of Marshall* (2018) 23 Cal.App.5th 477, 487; *Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738 [" 'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*, and *show how and why it is insufficient.*' "].) The failure to provide a fair summary of the evidence forfeits the claim on appeal. (*Schmidlin,* at p. 738; accord, *Symons Emergency Specialties v. City of Riverside* (2024) 99 Cal.App.5th 583, 598.)

### *Hourly Rate of Pay*

As we have recited, Bogdan testified at trial that he had an oral agreement with McMahon to pay him $175 per hour for the audit work he completed from November 2016 through January 2017—i.e., the amount McMahon billed clients for his time. Schwarcz argues Bogdan's testimony that he was entitled to this " 'pass-through' " rate was "contradictory at best." She stresses the fact McMahon was not alive to contradict Bogdan at trial. And she points to other evidence she asserts is inconsistent with such an exorbitant hourly rate. Specifically, she points to evidence Bogdan was only paid 30 percent of what was billed to the client for his first legal audit, that McMahon tended to micromanage all three of his employees, and that his overhead for 2016 was 25 percent of his revenue. In addition, when ruling on

20

the parties' UCL claims, the court found Boyko's testimony regarding her rate of pay at a pass-through rate not credible, and Schwarcz argues this finding is equally applicable to Bogdan's hourly rate of pay. At bottom, Schwarcz's complaint is best summarized by this statement in her brief: "It simply defies logic that a person would open a business, assume liabilities for same, spend his time overseeing the work of his staff (when he could have been billing his own time at higher rates), and then paying said staff the exact rate he stood to collect from clients without reduction."

The short answer to Schwarcz's argument is that the testimony of one witness is sufficient to establish a fact (*In re Marriage of Fregoso & Hernandez* (2016) 5 Cal.App.5th 698, 703), and, when reviewing for substantial evidence, we do not make credibility findings (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330 [assessing witness credibility is "the exclusive function of the trier of fact"]). Here, the jury clearly believed Bogdan, and that is sufficient to support the verdict. The court's subsequent conclusion—when considering the UCL claims—that Boyko's testimony she was entitled to a pass-through rate was not credible supports the jury's finding, rather than undercutting it as Boyko's situation was clearly factually distinguishable from Bogdan's.

Moreover, even if we were to put aside the fact that Schwarcz presented *no* evidence at trial that Bogdan's rate of pay was commercially unreasonable, we can conceive of reasons why McMahon paid him $175 per hour. For example, before deciding to go out on his own, McMahon carefully vetted Esfir's and Bogdan's ability to assist with his legal audits, and he could reasonably have concluded the two needed to be paid at a rate that would keep them loyal to the new business and disinclined to look for other

21

employment opportunities.[3]  In addition, legal auditing performed by Esfir and Bogdan—for which the methodology changed with each client—could reasonably be viewed as more complex than the simple data entry performed by Boyko.  Further, Boyko testified McMahon wanted to go out on his own because he was tired of corporate overhead and wanted more control over his business.  McMahon was billing himself out at $450 per hour, and, based on the record before us, he could have been billing his supervisory time out at that same rate in addition to billing that same time for Esfir and Bogdan.  Finally, there is some evidence in the record that McMahon might have been overcompensating all three of his employees because he had a romantic interest in Boyko and was trying to show her how financially generous he was.

In short, while we can understand Schwarcz's frustration that McMahon was not available to contradict Bogdan with respect to his rate of pay, she has failed to establish that insufficient evidence supported the jury's conclusion on this point.  We also note that Schwarcz was equally hampered by McMahon's own abysmal paperwork and failure to memorialize in writing his compensation arrangements with Esfir, Bogdan, and Boyko.

### *Waiting Time Penalties*

With respect to Schwarcz's second claim—that the daily rate of pay the jury set for purposes of calculating Bogdan's waiting time penalties ($637.90) was not supported by substantial evidence—her briefing runs afoul of the appellate maxims we have recited.  Specifically, Schwarcz failed to

---

[3]  Schwartz argues that the only evidence regarding Bogdan's rate of pay was this initial job, where he was paid only 30 percent of what was billed to the client.  But it is not unreasonable that McMahon agreed pay Bogdan less for this trial run than he ultimately agreed to pay Bogdan to support his legal auditing business once he went out on his own.

22

acknowledge in her briefing *any* evidence favorable to the jury's finding on this point, making only a conclusory argument devoid of any citations to the record. Schwarcz has therefore waived this issue.

Even if she did not, the record contains evidence supporting the jury's finding.

The jury was properly instructed that to recover waiting time penalties, Bogdan had to prove his daily wage rate at the time his employment with McMahon ended. Bogdan testified that his work ended in January 2017.

Thus, to calculate his daily rate of pay, the jury could reasonably have taken the amount he billed in January for legal auditing and divided it by 31. This is exactly what it did. The jury awarded Bogdan $94,832.50 in unpaid wages (541.90 hours at $175 per hour). Invoices for Bogdan's unpaid legal auditing in November and December 2016 amounted to 428.90 hours. If he worked the remaining 113 hours (541.90 hours minus 428.90 hours) in January at $175 per hour, he was entitled to receive $19,775 for January. $19,775 divided by 31 days is $637.90.[4]

## DISPOSITION

The judgment is affirmed.

---

[4] There is no merit to Schwarcz's argument that Bogdan's hourly rate of pay (for purposes of his wages claim) and his daily rate of pay at the time his employment ended (for purposes of determining waiting time penalties) conflict with each other. She ignores that the daily rate of pay for purposes of waiting time penalties applies only to a single month. Her argument is also based on an assumption, i.e., that Bogdan worked eight-hour days and 40-hour weeks, that is not supported by any evidence.

_____

Banke, J.

We concur:

_____

Humes, P. J.

_____

Langhorne Wilson, J.

A170254, Viner v. McMahon